UNITED STATES of America, Appellant,

v.

**Donald E. LASATER, Appellee.**

No. 75–1935.

United States Court of Appeals, Eighth Circuit.

Submitted April 12, 1976.

Decided May 17, 1976.

Anthony P. Nugent, Jr., Asst. U. S. Atty., Kansas City, Mo., for appellant; Bert C. Hurn, U. S. Atty., Kansas City, Mo., on the briefs.

Norman S. London, St. Louis, Mo., for appellee; Lawrence J. Fleming, St. Louis, Mo., on the briefs.

Before ROSS, STEPHENSON and HEN-LEY, Circuit Judges.

ROSS, Circuit Judge.

The United States appeals from the district court's entry of a "judgment of acquittal" in favor of Donald Lasater. Lasater is charged with four counts of perjury before a grand jury, in violation of 18 U.S.C. § 1623.

■ We hold that the district court was correct in finding that the testimony in question was not material to the grand jury investigation. Treating the district court's order as a dismissal of the indictment, we affirm the dismissal.[1]

In early 1975, a federal grand jury in the Western District of Missouri was investigating the affairs of former Missouri Governor Warren E. Hearnes. Among the subjects of its inquiry were possible criminal tax violations. The grand jury was interested in a bank account maintained in the Farmers Bank of Portageville, Missouri, in the name of the "Bootheel Committee for Hearnes." The account had been opened in October 1968 by J. V. Conran, a vice-president of the Farmers Bank and a leader in the politics of southeast Missouri.

The grand jury had before it evidence that Conran had made two deposits into the Bootheel account, and that both deposits were the proceeds of bond transactions with

---

1. Because the district court's order was entered prior to the attachment of jeopardy, it could not have been an acquittal. *See* part I, *infra.*

It is, rather, a dismissal of the indictment, appealable under 18 U.S.C. § 3731.

Mercantile Trust Co. of St. Louis. Appellee Lasater was, at the time of the transaction, president of Mercantile.[2]

The bond transactions worked in this way: Conran would purchase municipal bonds in the open market, borrowing the bulk of the purchase price from Mercantile and the remainder from other sources. He would hold the bonds for six months, and then sell them to Mercantile. The sale price would be in excess of his purchase price (and also in excess of market), so that Conran would have a substantial profit.

Conran deposited these profits in the Bootheel account. There were two series of transactions, one in 1968 and one in 1969. Conran's two deposits in the account totaled $63,900.60.

In 1973, Hearnes received a check from the Bootheel Committee in the amount of $58,874.80. This amount was included in his gross income for that year.

The federal prosecutors conducting the investigation, assisted by agents of the Internal Revenue Service, decided to investigate the possibility that Mercantile's transfer of funds to Conran was the result of an understanding between Mercantile and Hearnes, whereby Hearnes would confer some benefit on Mercantile (presumably, the deposit of state controlled funds). In exchange, Mercantile would transfer funds to Conran for Hearnes' use. It was the prosecutors' theory that if this were so, the deposits in the Bootheel account should have been included in Hearnes' gross income in 1968 and 1969 rather than in 1973 when they were reported.

In the course of its investigation, the grand jury discovered a letter, dated June 5, 1968, addressed to Conran, and signed by Lasater and Kenton Cravens. In the letter, Lasater indicated that he enclosed a note for Conran's signature for $165,000. He

expressed appreciation for the amount of business Conran had directed to Mercantile. He then wrote:

Mr. Cravens and myself are jointly signing this letter and binding ourselves to you and/or your estate to purchase not later than six months from this date $25,-000 in face amount of State of New York bonds maturing in 1988 and $200,000 of Milwaukee, Wisconsin bonds maturing in 1978 at a price not less than par.

At the time of the guarantee these bonds were selling at prices considerably below their par value. The bonds named were among those later purchased by Mercantile from Conran at a price in excess of market value, but below par value. The second transaction followed the same pattern.

On February 5, 1975, Lasater was called to testify before the grand jury to explain his role in these transactions. Prior to his testimony, an Internal Revenue Service agent, Edwin Reising, prepared a list of questions to be asked by the government attorneys conducting the grand jury proceedings. Certain questions from this list were used in the questioning. However, none of the questions on the list were among those which formed the basis for this perjury indictment.

Lasater was examined before the grand jury by three experienced prosecutors: Bert Hurn (U. S. Attorney for the Western District of Missouri), and two of his assistants. The government counsel on this appeal was not present. The grand jury later returned a four count indictment, charging that certain of Lasater's testimony was perjured. The testimony involved was as follows:

In Count I of the indictment:

Q. Of course, the letter that you have read, Grand Jury Exhibit 19 [the June 5 guarantee letter], who wrote that letter?

---

2. Kenton Cravens was chairman of Mercantile's board at the time. Cravens died prior to the time of Lasater's testimony.

J. V. Conran was also deceased at the time of this testimony.

A. Well, I didn't write the letter but it is written as if I did but I signed the letter.

\* \* \* \* \* \*

Q. Do you know who dictated this letter for your signature, of June 5, 1968?

A. I assume Mr. Cravens did. I don't really know. He had the letter prepared for me.

[The indictment charges falsity in that Lasater knew "that he did write the letter and did dictate said letter to his secretary."]

In Count II:

Q. Did the bank participate in the purchase of those bonds?

A. Not that I am aware of.

Q. If the bank had participated in the repurchase of those bonds, is it likely you would be unaware of it?

A. Yeah, I would think so. I really don't know. I didn't arrange for the purchase of bonds or the sale of bonds.

[Falsity is charged in that Mercantile participated in the purchase and repurchase of the bonds, Lasater was aware of this, and he himself participated in their purchase and sale.]

In Count III:

Q. Assuming they paid a higher price than the market value at the time for those securities, how would that transaction be reflected on the books and records of your bank?

A. I have no idea. I assume they paid market price for them. I really don't know.

[This is allegedly false in that Mercantile had paid "substantially in excess of market price" for the securities, and Lasater was aware of this.]

In Count IV:

Q. And what occasioned your meeting?[3]

A. I met him in Sikeston, Missouri, to in a sense explain to him that he had an alternative of paying off a loan or sell-

ing the bonds, whichever he chose to do.

[This is alleged to be false in that Lasater, in behalf of Mercantile, had directed and prearranged the disposition of the bonds, and had made the decision as to their disposition.]

Before proceeding, we note other portions of Lasater's grand jury testimony which are important to this appeal.

First, although Lasater denied authorship of the June 5 letter, he admitted signing it and testified at some length to the purposes behind it. Particularly, in response to the question, "Did you have anything to do with the setting up of the par value agreement?" Lasater said, "Yeah, I can answer that for you, maybe to make it easier in that sense. Cravens was interested in getting into better favor in Democratic politics, it's about that simple." Lasater discussed the details of the loan guarantee. He later stated that the purpose of the guarantee was to influence the Democratic administration so that Mercantile "would maybe not stand to lose as many state funds" on deposit at the bank. He testified that Cravens had signed a letter agreeing to indemnify him for any losses on the guarantee. He later destroyed his copies of both letters because "I didn't like the transaction at all. I think the transaction stinks."

Second, although in the testimony which is the subject of Count II Lasater denied knowledge that Mercantile had purchased the bonds, he later stated that, if the records of Conran's broker showed that Mercantile had purchased the bonds, those records would undoubtedly be correct.

Finally, in the testimony which led to Count IV, Lasater had given a brief explanation of a meeting he had with Conran in Sikeston, Missouri, in late 1968. He later testified more fully: "Well, I told Mr. Conran that I was very unhappy with this particular letter, this Exhibit 19, in terms of things, and that as far as I'm concerned

---

**3.** Lasater had met with Conran on one occasion, in late November or early December of 1968.

that par was totally unrealistic and I didn't know the reason for it to begin with but I wasn't going to stay with that. He could make his choice to sell the bonds then, pay off the loan or have us sell it and we will argue the rest of it out later."

The indictment was returned on February 27, 1975. It recited the allegedly false testimony set out above, and stated that each statement was made "with respect to" the question *whether these payments were taxable income to Hearnes in 1968 and 1969,* a question which was "material to the grand jury investigation."

A pretrial conference was held. The court and parties agreed that a hearing would be held, pursuant to then Fed.R. Crim.P. 12(b)(4),[4] at which all evidence on the issue of the materiality of these statements to the grand jury investigation would be adduced. It was agreed that the existence of materiality, an essential element of the offense, was a question for the court. The district judge decided, with the parties' consent, that he would make a final decision on the issue of materiality after this hearing. The hearing on materiality was in fact seen as the first half of a "bifurcated trial." At the second half, a jury would determine the issues of falsity and knowledge.

The materiality hearing was held on August 18 and 19. Considerable documentary evidence was received. IRS Agent Reising and Assistant U.S. Attorney White testified. Both stated that a purpose of calling Lasater before the grand jury was to determine whether any consideration had passed from Hearnes to Mercantile in exchange for the payments to Conran. White testified that each of the false answers alleged in the

indictment had impeded the grand jury in its investigation of this matter.

The district court entered extensive findings of fact and conclusions of law. Particularly, it found that the answers given to the grand jury did not "tend to influence, mislead or hamper the grand jury in its investigation * * * "; that the documentary evidence already before the grand jury was sufficient to show "how the payments were in fact made" by Mercantile to Conran; that the questions appearing in the indictment "were not calculated to develop precise and specific information which would have assisted the grand jury"; that White's assertion that he had been misled and the grand jury hindered should be rejected as conclusory; and that the answers given did not in fact impede the Assistant U.S. Attorney from asking whatever questions he may have wanted to ask.[5]

The district judge determined that the government had failed to establish that the statements made were material to the grand jury investigation. Since materiality is an essential element of the offense of perjury, he concluded, Lasater was entitled to a judgment of acquittal on all four counts. He entered such a judgment. No jury was ever empaneled.

Two issues are presented by the government's appeal. First, are further proceedings in this case barred by the fifth amendment's prohibition of double jeopardy? Secondly, if further proceedings are not barred, should they be ordered because the district court erred in finding for appellee on the issue of materiality?

*I. Double Jeopardy.*

Appellee contends that, because he has been "acquitted" by the district court,

4. Rule 12(b)(4) then read:
   (4) *Hearing on Motion.* A motion before trial raising defenses or objections shall be determined before trial unless the court orders that it be deferred for determination at the trial of the general issue. An issue of fact shall be tried by a jury if a jury trial is required under the Constitution or an act of Congress. All other issues of fact shall be determined by the court with or without a

jury or on affidavits or in such other manner as the court may direct.
   The rule has since been amended.

5. The U.S. Attorney had argued that Lasater's testimony prevented the grand jury from obtaining answers to four general questions, all going to the reasons behind these bond transactions. The district court found that the reasons these four questions were not asked were unrelated to the allegedly false statements.

further proceedings against him are prohibited by the double jeopardy clause. Of course, a defendant who has actually been acquitted cannot be retried. *Fong Foo v. United States,* 369 U.S. 141, 143, 82 S.Ct. 671, 672, 7 L.Ed.2d 629, 631 (1962); *Kepner v. United States,* 195 U.S. 100, 126, 24 S.Ct. 797, 808, 49 L.Ed. 114, 123 (1904); *United States v. Ball,* 163 U.S. 662, 16 S.Ct. 1192, 41 L.Ed. 300 (1896). No appeal can be heard from his acquittal. *See* 18 U.S.C. § 3731.

■ But, before refusing to hear a government appeal, a reviewing court must look beyond the label which the trial court gave its disposition of the indictment. It must look instead to the substance of the trial court's action. As the Supreme Court said in *Serfass v. United States,* 420 U.S. 377, 392, 95 S.Ct. 1055, 1064, 43 L.Ed.2d 265, 276 (1975):

> The word [acquittal] itself has no talismanic quality for purposes of the Double Jeopardy Clause. * * * In particular, it has no significance in this context unless jeopardy has once attached and an accused has been subjected to the risk of conviction.

■ Thus, there can be no acquittal until jeopardy attaches. And the test for the attachment of jeopardy is whether the defendant had been "put to trial before the trier of facts, whether the trier be a jury or a judge." *Id.,* 420 U.S. at 388, 95 S.Ct. at 1064, 43 L.Ed.2d at 274. There can be no jeopardy "[w]ithout risk of a determination of guilt * * *." *Id.,* 420 U.S. at 391–92, 95 S.Ct. at 1064, 43 L.Ed.2d at 276.

■ The order here was not in substance an acquittal. This was to be a jury-tried case,[6] and jeopardy *could not* attach until the jury was empaneled. *Serfass v. United States, supra,* 420 U.S. at 388, 95 S.Ct. at 1061, 43 L.Ed.2d at 273. No jury had been empaneled when judgment was entered.

Appellee contends that the trial judge, in taking evidence on the issue of materiality, was acting as a "trier of fact," so that jeopardy attached. This argument ignores the principle that materiality is ultimately a question of law even though its proper determination is essentially a factual matter for the trial judge to determine. *See United States v. Koonce,* 485 F.2d 374, 380 (8th Cir. 1973).

The trial judge here was without power to enter a judgment of conviction. Guilt could be found only by the jury, which was to hear the issues of falsity and knowledge. And, as the Court noted in *Serfass,* without a risk of determination of guilt there can be no attachment of jeopardy.

Thus, jeopardy did not attach here. And because jeopardy did not attach, the district court's order was not in substance an acquittal. It was, rather, a dismissal of the indictment. As such, it presents no bar to this appeal.

## II. Materiality.

We turn, then, to the principal issue before us, whether the district court erred in holding that these allegedly false statements were material to the grand jury investigation.

■ A false declaration before a grand jury constitutes perjury only if it is "material" to the grand jury's work. 18 U.S.C. § 1623. That is, the false declaration must tend to "influence, mislead or hamper" the grand jury's investigation of a matter which is within its authority to investigate. *United States v. Koonce, supra,* 485 F.2d at 380; *Dolan v. United States,* 218 F.2d 454, 458 (8th Cir. 1955), *cert. denied,* 349 U.S. 923, 75 S.Ct. 665, 99 L.Ed. 1255; *see Carroll v. United States,* 16 F.2d 951, 953 (2d Cir. 1927), *cert. denied,* 273 U.S. 763, 47 S.Ct. 477, 71 L.Ed. 880. There is no dispute here that this is the governing legal standard; the only disagreement between the parties concerns its application to the facts of this case.

We have examined the record carefully, considering the effect of each statement in light of "the factual situation in which the testimony was given * * *". *United*

6. Neither party had waived its right to trial by jury.

*States v. Koonce, supra,* 485 F.2d at 380–81. We conclude that the district court properly found that the allegedly false statements did not tend to impede the grand jury investigation, and so were not material. Accordingly, we affirm the dismissal of the indictment.

We examine the four counts of the indictment seriatim.

### A. Count I.

■ Lasater admitted that he signed the June 5 letter of guarantee. However, he denied "writing" the letter and instead attributed it to Cravens. The government claims that these statements were false in that Lasater himself dictated the letter.

Assistant U.S. Attorney White testified that he wished to learn the identity of the letter's author "because I believed that the author of the letter could shed some light on the reasons why such an arrangement existed and precisely what the details of the arrangement were, who they were with, whether this transaction was really intended to benefit Hearnes." He indicated that Lasater's denial of authorship prevented him from eliciting this information. The government contends that the false testimony therefore impeded the investigation.

The government ignores, however, those parts of Lasater's grand jury testimony in which he discussed the guarantee letter and its purpose in substantial detail. He admitted signing the letter. He stated that its purpose was to curry favor with the Democratic administration, so that state funds would not be withdrawn from Mercantile.

Admittedly, the government attorneys did not ask the ultimate questions: whether the transaction was intended to benefit Hearnes, and whether Hearnes was to do anything in return. But the failure to ask these questions could not have resulted from Lasater's denial of authorship of the guarantee letter. His admissions showed that he had participated in this guarantee, and knew a great deal about its purposes. Whatever stopped the prosecution or grand jurors from asking the ultimate questions, it clearly was not a belief that Lasater had not authored the guarantee letter, or that he was ignorant of its purpose.

The only thing concealed by Lasater's false testimony (if indeed it was false) was the extent of his own part in arranging the guarantee. While this might have been material to an investigation of Lasater's actions, it was clearly not material to this investigation of Warren Hearnes.

The testimony set out in Count I, then, did not in any way tend to impede the grand jury. The district court's finding that it was not material to the investigation was correct.

### B. Counts II and III.

■ Because the testimony in Counts II and III relates to the same subject matter, we discuss the two counts together. In the Count II testimony, Lasater denied being aware of the bank's participation in the purchase of the bonds from Conran. He denied personally arranging "the purchase of bonds or the sale of bonds." In the Count III testimony, after being informed that the bank had purchased the bonds, he stated that he assumed that the bank paid market price for them.

The government asserts that Lasater knew Mercantile had participated in the repurchase of the bonds, and that he himself participated. Further, it is alleged that Lasater knew that the purchase price was substantially in excess of market.

White contended that Lasater's testimony on these points deterred him from asking "who in the bank authorized such a purchase, who had knowledge of it, what the discussion was surrounding how the purchase would be accomplished, and in effect who was going to set the price for the bonds, how it was to be done." It left him "with no place to go with that particular witness in asking him additional questions about the transaction since he indicated he had no knowledge of it."

The district court was not convinced by White's conclusory statements that he was left "no place to go" by Lasater's testimony. Nor are we. The evidence before the grand

jury showed that the entire series of events—the guarantee letter, the bank's loans to Conran, Conran's purchase of bonds, and the bank's purchase of the bonds from Conran—were parts of a single transaction. And Lasater admitted, in discussing the guarantee letter, that he knew a great deal about the purposes behind that transaction and he described those purposes in some detail.

If the government attorneys did not ask the "ultimate questions" about Hearnes' involvement, it could not have been because Lasater denied participation in this one aspect of the transaction, i. e., the bank's purchase of the bonds. He had admitted too much for them to believe he knew nothing. These statements, while they again might have tended to minimize Lasater's role in the transaction, did not minimize the role of the bank or in fact tend to impede the investigation of Hearnes' alleged offenses. The district court properly found that they were not material.

### C. Count IV.

■ In one of the first substantive questions asked him, relating to his meeting with Conran, Lasater stated that he met Conran in Sikeston, Missouri, "to in a sense explain to him that he had an alternative of paying off a loan or selling the bonds, whichever he chose to do." The government alleges that this was false in that Lasater had already directed and prearranged the disposition of the bonds, and made the decision as to their disposition.

After this question and Lasater's brief answer, the questioning was diverted to another area before Lasater had an opportunity to explain further. Much later in the questioning, Lasater returned to the subject of this meeting. He said he had told Conran that he did not like the agreement whereby Conran would sell the bonds to him and Cravens at par. He explained that he had given Conran a choice: he could "sell the bonds then, pay off the loan, or have us sell it and we will argue the rest of it out later."

Thus, Lasater testified that Conran's choice was to sell the bonds, or have the bank sell the bonds. This is not substantially different from the government's version, that Lasater had arranged the disposition of the bonds.

More importantly, there is no showing whatever how this discrepancy as to the substance of the Sikeston meeting could have affected the investigation of Hearnes. White did not say what he sought to discover by discussing this meeting or why he asked Lasater no questions about the direct involvement of Hearnes. There was no showing that the meeting related to the government's theory that the Bootheel funds were income to Hearnes in 1968 and 1969, or that Lasater's testimony about the meeting tended to deter the grand jury from investigating that theory. There was, in short, an utter lack of proof that this allegedly false statement was material. The district court acted properly in holding that it was not.

■ The grand jury performs an important function in our judicial system, as the device by which criminal investigations are conducted and criminal proceedings instituted. *See generally Branzburg v. Hayes,* 408 U.S. 665, 687, 92 S.Ct. 2646, 2659, 33 L.Ed.2d 626, 643 (1972). Any false testimony before a grand jury, which tends to impede its investigation, should be diligently prosecuted.

But Congress has manifested its intent that the serious sanction of a perjury conviction be imposed only if the false testimony in fact tends to impede the grand jury. To allow the perjury statute to be invoked where the alleged misstatement relates only to a peripheral matter would unwisely expand the statute's scope. It would render the measures taken against the offense "so severe as to discourage witnesses from appearing or testifying." *Bronston v. United States,* 409 U.S. 352, 359, 93 S.Ct. 595, 600, 34 L.Ed.2d 568, 574 (1973). We decline to so extend the statute's reach.

"Precise questioning is imperative as a predicate for the offense of perjury." *Id.,* 409 U.S. at 362, 93 S.Ct. at 602, 34 L.Ed.2d

at 576. The questioning here can hardly be described as precise. These three experienced prosecutors, including the United States Attorney himself, knew that they were seeking evidence tying Warren Hearnes to the bond transactions. Appellee admitted that he knew a great deal about the bond transactions, and it was equally clear that the bank and Lasater were directly involved in a scheme to divert bank funds into the Bootheel account. Yet none of the three prosecutors asked him substantive questions about Warren Hearnes.[7] They cannot now blame their failure on appellee's alleged minor misrepresentations of his own role in the affair.

We agree with the district court that the failure of the government prosecutors to find answers to their ultimate questions could not have resulted from the allegedly false statements charged in the indictment. It is apparent that the finding of a lack of materiality was correct.

The judgment of the district court, treated as a dismissal of the indictment, is affirmed.

---

7. The prosecutors never did ask whether the bank had any dealings with Warren Hearnes. They did not ask whether Hearnes knew of, or was in any way involved in, these transactions. These failures cannot be explained by suggestions that these three seasoned prosecutors were in awe of the witness as suggested by appellant at oral argument.

Much of the prosecutors' conduct in this case is difficult to understand. Appellee attempts to explain it by asserting that the prosecution acted in bad faith. He contends that their sole motive in seeking an indictment was their desire to compel him to implicate former Governor Hearnes. Indeed, Assistant U.S. Attorney White did testify that the desire to aid the Hearnes investigation was "a consideration" in the decision to seek the instant indictment. White testified as follows at the materiality hearing:

Q. And is it your thought that if you indicted him that you might then be able to work out some arrangement where he might come forward with some information that might help you in the Hearnes investigation? Would that be a fair statement, sir?
A. I certainly considered that a possibility, yes, sir.
Q. And that affected your procedures in returning this indictment when you did and at the time that you did, is that correct, sir?
A. I think that it had something to do with it. I am not here saying that that was controlling, but I think that it in my own mind had something to do with it.
Because of our disposition of the materiality issue, we need not reach the question whether the prosecutors acted from improper motives, or whether their motives affected the indictment's validity.