UNITED STATES of America, Appellee,

v.

Richard O. KELLY, Appellant.

No. 74–1535.

United States Court of Appeals,
Ninth Circuit.

July 19, 1976.

Rehearing and Rehearing En Banc
Denied Sept. 13, 1976.

Philip I. Palmer, Jr. (argued), of Palmer, Palmer & Coffee, Dallas, Tex., for appellant.

John Resich, Asst. U.S. Atty., Los Angeles, Cal. (argued), for appellee.

Before TRASK and GOODWIN, Circuit Judges, and ENRIGHT,* District Judge.

ALFRED T. GOODWIN, Circuit Judge:

Richard O. Kelly appeals from a conviction on one count of perjury.[1] We affirm.

---

* The Honorable William B. Enright, United States District Judge for the Southern District of California, sitting by designation.

1. The trial court granted a motion for acquittal directed to a second count of the perjury indictment.

In February, 1968, Kelly was introduced to William J. Cudd, who appeared to be a man of means. Cudd represented that he possessed considerable wealth in the form of promissory notes issued by the Baptist Foundation of America. Cudd told Kelly he wished to buy a yacht, using some of the promissory notes as purchase money. Kelly set out to acquire a yacht for Cudd on some basis that would be profitable to Kelly. Kelly associated Dan Manning in the venture. Either Manning or Kelly contacted James Powell[2], a salesman employed by the Kona Marina in San Diego. Powell eventually located Ralph Kappler, an Oregon resident, who agreed to sell his yacht, the Gannett, II, for $330,000 in BFA notes. Under the agreement, the sale was to be made to Manning's wholly owned corporation, M-K Enterprises. Kelly's plan was that M-K Enterprises would convey the yacht to him and he would convey it at a profit to Cudd. The initial seller, Kappler, was not made aware of the involvement of either Kelly or Cudd in the transaction.

After the agreement was reached, Kelly informed Cudd that he had located a suitable vessel. Kelly stated that the purchase price would be $560,000 in BFA notes plus $55,000 in cash. Kelly intended to use the cash to pay Powell's brokerage commission and to compensate Manning for guaranteeing payment of the BFA notes to be issued Kappler. Kelly intended to keep the remaining price difference, $230,000 in BFA notes, as his profit.

Cudd agreed to the transaction and delivered $560,000 in notes to Kelly. Manning then used $300,000 in BFA notes and a personal note for $30,000 [3] to pay Kappler the purchase price. Kelly's name did not appear on the chain of title to the notes, which ran from Cudd directly to M-K En-

---

2. There is some ambiguity in the testimony regarding the initiation of contact with Powell. Powell testified that Kelly made the initial contact, while Kelly stated he did not recall how contact was made.

3. Manning's personal note for $30,000 was later exchanged for a $30,000 BFA note.

terprises.[4] Title to the boat was transferred to M-K Enterprises. Kelly used the excess $230,000 in BFA notes, his profit, to settle various claims.

In September, 1968, the interest came due on the notes held by Kappler. When the interest was not paid, Kappler called Manning and demanded payment. Manning made repeated assurances, but the payment was not forthcoming. Then, on February 10, 1969, Kelly called Kappler. Kappler was away from his phone, but returned the call from his architect's office. In this call, Kelly told Kappler that he, Kelly, was associated with the Baptist Foundation and that he would be meeting with the Foundation the next day regarding payment of the interest. On February 11, 1969, Kelly again called Kappler and requested that he voluntarily reset the interest date back six months. Kelly further stated that if Kappler would reset the interest dates, Kelly would see that the Foundation paid the principal and interest from then on as they became due. Kappler asked for time to think over the request. When Kelly called again on the evening of February 11, he told Kappler that if Kappler would reset the interest date then the overdue interest would be paid when the notes matured. When Kappler refused, Kelly told him that the interest had already been paid to a Bill Cudd.

Four years later, on February 16, 1973, Kelly was called before a federal grand jury investigating possible violations of federal laws resulting from the negotiation of worthless BFA notes. He testified in part that he had not had any direct dealings with Kappler and, more particularly, that he had not telephoned Kappler on February 11, 1969, to ask him to reset the interest dates on the BFA notes.[5] Kelly was subsequently indicted under 18 U.S.C. § 1623 for perjury. After a nonjury trial, Kelly was convicted on one count of the indictment.

## I. Lack of Target or Miranda Warnings

Kelly contends that the grand jury testimony should have been suppressed because he was not given a Miranda warning or advised that he was a possible target of the grand jury investigation.

■ Kelly was adequately advised of his Fifth Amendment rights.[6] His appearance

---

**4.** The notes were apparently rewritten after the Cudd-to-Kelly transfer to eliminate reference to Kelly in the chain of title.

**5.** Kelly testified as follows:

"Q. Isn't it a fact that in April 1968 Cudd gave you a $650,000 Baptist Foundation promissory note?
A. No.
Q. He did not?
A. No, sir.
Q. How much did he give you?
A. I don't remember the date, but the total amount of notes was $560,000.
Q. All right, sir. And then you used $330,000 worth of those notes to purchase the GANNETT?
A. That's right.
Q. And that was from a man by the name of Ralph Kappler?
A. I did not have any dealings with Mr. Kappler. Mr. Manning, as I told you before, and his broker in San Diego made the transaction with Mr. Kappler."

\* \* \* \* \* \*

"Q. Did you ever have any conversations with Mr. Kappler?
A. No, sir.
Q. You never did?
A. No.

Q. Did you ever have any conversations with Mr. Kappler's representative?
A. No.
Q. Isn't it a fact, sir, on February 11, 1969, you telephoned Mr. Kappler and requested that he voluntarily reset the date on the Baptist Foundation notes to September 1, 1968?
A. Me? Absolutely not.
Q. Thereby eliminating the interest which was then due on the note?
A. Absolutely not.
Q. Are you certain of that, sir?
A. I'm as certain as I can be. I mean, to my knowledge I have never talked to the man in my life."

**6.** Before testifying before the grand jury, the appellant was warned as follows:

"Q. Mr. Kelly, you have been subpoenaed before this Grand Jury because it believes that you have information which may be of assistance to it with respect to an inquiry that it's conducting now. That investigation involves among other things violations of the Federal Mail and Wire Fraud Statutes, in addition to other possible violations. Do you understand that?

before the grand jury was not a custodial interrogation. A full *Miranda* or target warning was not required. *United States v. Mandujano,* —— U.S. ——, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1976); *Gollaher v. United States,* 419 F.2d 520, 523–24 (9th Cir. 1969).[7]

## II. *Materiality*

■■■ Kelly contends that his telephone calls to Kappler were insufficiently material to support a conviction. The test for materiality in perjury prosecutions was set forth by this court in *United States v. Lococo,* 450 F.2d 1196, 1199 (9th Cir. 1971).[8] Under the *Lococo* test, the government need not show that the false testimony actually impeded the grand jury investigation or that it related to the primary subject of the investigation. It is sufficient for the government to prove that the testimony was relevant to any issue under consideration by the grand jury. If the falsity of the testimony would have the natural tendency to influence the grand jury's investigation,

it is material. 450 F.2d at 1199.[9] Here, one of the subjects of the grand jury's investigation was the extent of Kelly's involvement in the negotiation of BFA notes. By testifying falsely, he withheld from the grand jury direct evidence of the extent of his personal involvement. The testimony was thus material.

## III. *Actual Falsity*

Kelly contends that the evidence was insufficient to show the actual falsity of the statements made to the grand jury. Kappler testified at trial that he received three telephone calls from Kelly. However, Kappler had no recollection of two other calls which Kelly's telephone bills indicate were placed to Kappler's telephone[10] and one other call which the bills indicate was placed to Kappler's architect's phone.[11]

■■■ The bare telephone records are insufficient to show the actual falsity of Kelly's testimony denying the calls which Kap-

---

A. Yes, I do.

Q. Now, sir, before I or any of the Grand Jurors ask you any more questions, I would like to inform you as to what your rights and responsibilities are with respect to your testimony today before the Federal Grand Jury.

First, you have an absolute constitutional right to refuse to answer any question which you honestly believe may tend to incriminate you. Do you understand that?

A. Yes.

Q. Second, while you do not have the right to have an attorney present in the Grand Jury room, if you do feel the need of assistance of counsel during the course of any questions that are asked you, make that need known to the Grand Jury foreman, who is sitting to your left, and I'm sure he will allow you to leave the Grand Jury room and consult with counsel.

Are you represented by an attorney today?

A. No, I'm not.

Q. Now, sir, if you do so decide to answer any question that is put forth to you, you are under an absolute obligation to answer each such question completely and truthfully. Do you understand that?

A. Yes.

Q. In the event that you do not answer such a question truthfully and completely, you may subject yourself to the penalties of perjury. Do you understand that?

A. Uh-huh.

Q. Do you have any questions concerning your rights and/or responsibilities before this Grand Jury?

A. No."

7. *United States v. Mandujano,* —— U.S. ——, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1976), *reversing United States v. Mandujano,* 496 F.2d 1050 (5th Cir. 1974), also casts doubt upon some of the language in *United States v. Wong,* No. 74–1636 (9th Cir., Sept. 23, 1974), *cert. granted,* —— U.S. ——, 96 S.Ct. 2224, 48 L.Ed.2d 829 (June 1, 1976), which was inconsistent with *Gollaher v. United States,* 419 F.2d 520 (9th Cir. 1969).

8. *Lococo* was decided under 18 U.S.C. § 1621, but neither party suggests that the standard of materiality applicable to perjury prosecutions under § 1623 differs from that applicable to § 1621 prosecutions.

9. After this case was submitted, Kelly called our attention to *United States v. Lasater,* 535 F.2d 1041 (8th Cir. 1976). To the extent that *Lasater* advocates a more restrictive view of materiality in perjury prosecutions than does *Lococo,* we prefer the rationale of the *Lococo* case.

10. The two calls were shown as made on January 23, 1969, and February 5, 1969.

11. This call was shown as made on February 3, 1969.

pler did not remember. *United States v. Laughlin*, 226 F.Supp. 112, 113 (D.D.C.1964). Nor does Kelly's in-court stipulation that five telephone calls were made between his *telephone* and Kappler's *telephone* obviate the necessity for proof of a conversation between Kappler and Kelly. But Kappler testified from present recollection as to three of the six calls. The trier of facts was obviously convinced on the basis of this evidence that Kelly's statements to the grand jury were false. Kappler's testimony was at least partially corroborated by the telephone bills,[12] and we cannot say that the trial judge's determination of actual falsity was clearly erroneous. *Bush v. United States*, 267 F.2d 483, 485 (9th Cir. 1959).

## IV. *Knowing Falsity*

Kelly contends that the evidence is insufficient to show that he knew the statements he made to the grand jury were false.

■ An accused can be convicted of perjury under § 1623 only if his statement to the grand jury was knowingly false. 18 U.S.C. § 1623(a). Actual knowledge of falsity ordinarily must be inferred from circumstantial evidence. *United States v. Sweig*, 441 F.2d 114, 117 (2d Cir. 1971); *Gebhard v. United States*, 422 F.2d 281, 287–88 (9th Cir. 1970).

■ Viewing the facts in the light most favorable to the government, *United States v. Magana*, 453 F.2d 414, 415 (9th Cir. 1972), the court's finding that Kelly's testimony was knowingly false must be sustained. The trier of facts could properly conclude that the testimony was actually false. His conclusion that Kelly had a motive to lie was equally correct: By denying the phone calls, Kelly concealed from the grand jury the extent of his personal involvement in the BFA scheme.

Finally, the record contains evidence of the subjective importance of the telephone calls to Kelly. At one point he was asked if he had an interest in keeping Kappler calm. Kelly admitted that he did, but he denied remembering the calls.[13] Kelly now contends that the subjective importance of the calls was minimal since the deal had already closed. This contention, directly contrary to the admission made at trial, is nonsense.

■ Kelly argues strenuously that the four-year period between the telephone calls and his appearance before the grand jury ought to preclude a perjury conviction. The span of time over which an accused has allegedly retained memory of an event is indeed relevant to the issue of knowing falsity and was taken into account by the trial judge here. But we cannot say that any particular lapse of time will immunize a witness from the consequences of lying. If the evidence is sufficient to show that the accused actually remembered the event, then a perjury conviction must be sus-

12. There was corroboration with respect to the three phone calls on February 10th and February 11th, since these calls appeared on Kelly's phone records. Kappler's failure to recollect the other three calls does not necessarily imply faulty recollection on his part since the calls could have been received by another party, even though two are shown as person-to-person calls. *See United States v. Laughlin*, 226 F.Supp. 112, 113 (D.D.C.1964).

13. The appellant testified as follows:
"THE COURT: Why were you concerned about Kappler?
THE WITNESS: I wasn't concerned about Kappler, your Honor, but I am still in the boat transaction where Cudd is refusing to pay the interest, or at least he is telling me that he is refusing to let the Foundation pay the interest until the boat is delivered to him. And Manning on the other side is saying, 'I am not going to give him the boat until he gives me the $50,000.'
THE COURT: You wanted to keep Kappler calm—
THE WITNESS: I would have been happy to keep Kappler calm. I think the logical thing for me to do would have been to call Kappler. And I see nothing wrong with me talking to Mr. Kappler. If I had remembered it I would have said I remembered it.
THE COURT: Because if Kappler hadn't kept calm it could have screwed the whole deal up?
THE WITNESS: My $230,000 would be gone.
THE COURT: So you had an interest in keeping Kappler calm?
THE WITNESS: Yes, sir."

tained, regardless of the length of time separating event and testimony.

## V. *Motion for New Trial*

Kelly contends that the trial court committed reversible error in overruling his motion for a new trial. The motion was made on the basis of new polygraph evidence. Without reaching the issue of the admissibility of such evidence, we hold that the trial court did not abuse its discretion in denying the motion. *United States v. Craft,* 421 F.2d 693, 695 (9th Cir. 1970). The polygraph examination could have been administered prior to trial. Thus, the appellant failed to exercise the requisite diligence in adducing the polygraph evidence. *See Fernandez v. United States,* 329 F.2d 899, 904 (9th Cir. 1964).

The judgment of conviction is affirmed.