**UNITED STATES of America, Appellee,**

v.

**William Fred PHILLIPS, Appellant.**

**No. 75–1413.**

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 3, 1975.

Decided June 29, 1976.

Rehearing Denied July 26, 1976.

Certiorari Denied Dec. 6, 1976.
See 97 S.Ct. 530.

---

ROSS, Circuit Judge.

William Fred Phillips appeals his conviction of perjury in violation of 18 U.S.C. § 1623. The case was submitted to a jury which returned a guilty verdict. We vacate the conviction and remand with directions for further proceedings.

Phillips was prosecuted for knowingly making material false statements before a grand jury convened in Kansas City, Missouri. The grand jury was convened in December 1971 to investigate a conspiracy involving certain persons engaged in organized crime from Kansas City and certain nightclub owners from northeastern Oklahoma. The objective of the conspiracy was to establish illegal gambling and prostitution activities in the Oklahoma nightclubs by offering bribes to local government officials in return for protection from the law.

One of the principals was Frank Grayson, an Oklahoma district attorney, who was providing protection for gambling at certain local clubs. Defendant Phillips, then a practicing attorney and Oklahoma state senator, was a close friend and political supporter of Grayson. Grayson testified before the grand jury that certain persons had told him that Phillips had stated that he could control Grayson with respect to illegal club operations. Specifically, Grayson testified that Charles Davis, owner of a major development named Shangri La Lodge, told him that Phillips stated he could arrange anything that Davis needed in the way of local protection.

In this context, Phillips was called before the grand jury on August 1, 1972. Defendant repeatedly denied that he had ever stated to anyone that he could arrange protection from local law enforcement officials. He specifically denied that he made any representations to persons affiliated with the Shangri La that he could control local law enforcement officials with respect to illegal gambling, liquor, narcotics or prostitution.[1]

The critical evidence admitted at trial was a tape recorded meeting between Phil-

Michael De Feo, Sp. Atty., U. S. Dept. of Justice, Kansas City, Mo., for appellee; Bert C. Hurn, U. S. Atty., and Gary Cornwell, Sp. Atty., Organized Crime & Racketeering Section, Crim. Div., U. S. Dept. of Justice, Kansas City, Mo., on brief.

Joseph P. Jenkins, Estes Park, Colo., for appellant; Phillip L. Waisblum, Kansas City, Mo., on the brief.

Before GIBSON, Chief Judge, and LAY and ROSS, Circuit Judges.

1. See note 7, *infra*.

lips, Davis and George Overton, manager of the Shangri La. The conversation was recorded on July 7, 1971, at a time when Phillips was representing Davis and Overton before the Grand River Dam Authority regarding certain improvements of the Shangri La. The conversation was recorded by a private detective, not under color of law, at the instigation of Davis and Overton. Phillips was not aware that the conversation was recorded.

The apparent purpose of the July 7 meeting was to settle on a fee arrangement between Phillips and the Shangri La management. The purpose of recording the conversation is unknown.

During the course of the meeting, Phillips told Davis and Overton that illegal liquor and gambling operations could be run at the Shangri La on a limited basis. At one point, Phillips stated, "I can, I can control Frank[,]" in obvious reference to district attorney Grayson. At trial, the government's theory was that Phillips' statement was a representation that he could induce Grayson to provide protection for illegal operations at the Shangri La.

Before trial, defendant filed a supplemental motion to suppress the tape recording on the grounds that the conversation was recorded in violation of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510, *et. seq.* Defendant also moved to suppress the tape recording on the grounds that he was not admonished of his *Miranda* rights before the grand jury. The motion was denied in all respects and the tape and its contents were admitted at trial.

The case was originally assigned to Judge Duncan who ruled on all pretrial motions and presided throughout the trial. At the conclusion of trial, defendant moved for a directed acquittal and a new trial. The motions were pending when Judge Duncan died on July 31, 1974. Judge Hunter was then assigned to the case. Pursuant to Fed.R.Crim.P. 25(b), Judge Hunter certified that he could fairly and adequately dispose of the post-trial motions. After reviewing the record, Judge Hunter denied defendant's motions for acquittal and a new trial.

Defendant alleges numerous points of error on this appeal. Because of the limited nature of our remand, we review all of these contentions.

## I. The Admissibility of the Tape Recording under 18 U.S.C. § 2511(2)(d).

■ Defendant's supplemental motion to suppress alleged that the conversation between himself, Davis and Overton was recorded for the purpose of committing a tortious act in violation of 18 U.S.C. § 2511(2)(d). No evidence was adduced before or during trial as to why Davis and Overton caused the conversation to be recorded. Defendant argues that the government held the ultimate burden of proving that the conversation was not recorded for any criminal, tortious or other injurious purpose, and, since no evidence was proffered in this regard, the tape should have been suppressed. While we hold that the ultimate burden rested with the defendant to show that the tape was "unlawfully" recorded, our review of the record convinces us that defendant was denied a meaningful opportunity to meet this burden. Accordingly, we vacate the judgment of conviction and remand for a hearing in order to afford the parties an opportunity to present evidence as to the purpose of the recording.

■ Title III of the Omnibus Crime Control and Safe Streets Act of 1968 sets forth a comprehensive legislative scheme regulating the interception of oral and wire communications. This legislation attempts to strike a delicate balance between the need to protect persons from unwarranted electronic surveillance and the preservation of law enforcement tools needed to fight organized crime. S.Rep. 90–1097, U.S.Code Cong. & Admin.News, pp. 2112, 2153–2158 (1968).

Section 2511(1)(a) generally prohibits the willful interception of any wire or oral communication. Section 2511(2)(d) provides an exception and subexception to the general rule. That section reads as follows:

It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire or oral communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception *unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State or for the purpose of committing any other injurious act.* (Emphasis supplied.)

This section was missing from Title III when the bill was first reported out of committee. S.Rep. 90–1097, U.S.Code Cong. & Admin.News, pp. 2112, 2182 (1968); *Meredith v. Gavin,* 446 F.2d 794, 798 (8th Cir. 1971). At the urging of Senators Hart and McClellan however, § 2511(2)(d) was added to the bill, 114 Cong.Rec. 14695 (May 28, 1968), " * * * to prohibit a one-party consent tap, [where the monitoring is conducted not under color of law,] except * * for private persons who act in a defensive fashion." *Id.* at 14694. In the words of Senator Hart:

* * * [W]henever a private person acts in such situations with an unlawful motive, he will violate the criminal provisions of title III and will also be subject to a civil suit. Such one-party consent is also prohibited when the party acts in any way with an intent to injure the other party to the conversation in any other way. For example the secret consensual recording may be made for the purpose of blackmailing the other party, threatening him, or publicly embarrassing him. The provision would not, however, prohibit such activity when the party records information of criminal activity by the other party with the purpose of taking such information to the police as evidence. Nor does it prohibit such re-

cording in other situations when the party acts out of legitimate desire to protect himself and his own conversations from later distortions or other unlawful or injurious uses by the other party.

*Id.* The effect of § 2511(2)(d), then, is to prohibit any interception, use or disclosure of oral or wire communications by a person not acting under color of law where the purpose is to commit any criminal, tortious or injurious act. *Meredith v. Gavin, supra,* 446 F.2d at 798. This determination must be made on a case-by-case basis. *Id.* at 799.

■ 18 U.S.C. § 2515 imposes an evidentiary sanction to compel compliance with § 2511. That section provides that any oral communication intercepted in violation of the Act shall not be received in evidence in any judicial proceeding.[2] Section 2515 is not self-executing however. Section 2518(10)(a) provides that any aggrieved person may file a motion to suppress the contents of any unlawfully intercepted oral communication. This section " * * * provides the remedy for the right created by section 2515." S.Rep. 90–1097, U.S.Code Cong. And Admin.News, pp. 2112, 2195 (1968). Thus, as the government asserted at oral argument, whether the conversation was recorded for a permissible or impermissible purpose is a matter of suppression properly cognizable at a pretrial suppression hearing. *Id.*

■ Under traditional search and seizure law, "[t]he burden is, of course, on the accused in the first instance to prove to the trial court's satisfaction that wire-tapping was unlawfully employed." *Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307 (1939). *Accord, Canaday v. United States,* 354 F.2d 849, 857 (8th Cir. 1966); *United States v. Polizzi,* 500 F.2d 856, 910 n. 6 (9th Cir. 1974), *cert. denied,* 419 U.S. 1120, 95 S.Ct. 802, 42 L.Ed.2d 820 (1975); *United States v. Ma-*

---

**2.** Section 2515 reads:

Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in

or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter.

gaddino, 496 F.2d 455, 459–460 (2d Cir. 1974); Nolan v. United States, 423 F.2d 1031, 1041 (10th Cir. 1969), cert. denied, 400 U.S. 848, 91 S.Ct. 47, 27 L.Ed.2d 85 (1970). The prima facie burden of proving the ultimate illegality should be distinguished from the burden to prove taint flowing from that illegality. "* * * [W]hen an illegal search has come to light, [the government] has the ultimate burden of persuasion to show that its evidence is untainted." (Emphasis supplied.) Alderman v. United States, 394 U.S. 165, 183, 89 S.Ct. 961, 972, 22 L.Ed.2d 176 (1969).

■ Available legislative history in regard to §§ 2511(2)(d) and 2515 reflects no congressional desire to change the traditional burden of proof with respect to suppression of electronically gathered evidence. As stated in S.Rep. 90–1097, U.S.Code Cong. And Admin.News, pp. 2112, 2185 (1968):

> [Section 2515] must, of course, be read in light of section 2518(10)(a) discussed below, which defines the class entitled to make a motion to suppress. *It largely reflects existing law.* It applies to suppress evidence directly (*Nardone v. United States*, 302 U.S. 379, 58 S.Ct. 275 [82 L.Ed. 314] (1937)) or indirectly obtained in violation of the chapter. (*Nardone v. United States*, 308 U.S. 338, 60 S.Ct. 266 [84 L.Ed. 307] (1939).) There is, however, no intention to change the attenuation rule * * * [,] *[n]or generally to press the scope of the suppression role beyond present search and seizure law.* (Emphasis supplied.)

We perceive sound reasons for preserving the traditional allocation of burden of proof in this context. Sections 2511(2)(d) and 2515 require the exclusion of an intercepted communication if it was intercepted for *any* criminal, tortious or other injurious pur-

pose. To require the government or any other party to prove as a matter of foundation that an interception was made for *no* criminal, tortious or other injurious purpose would create an impossible burden of proving three negatives. Logic requires that the party against whom the evidence is offered, the defendant here, carry the ultimate burden of alleging and proving the specific criminal, tortious, or other injurious purpose for which the interception was made.

■ This is not a case where the fact to be proved is a material part of the act proscribed. *Compare Mullaney v. Wilbur*, 421 U.S. 684, 702, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975) (government must prove beyond a reasonable doubt the absence of heat of passion on sudden provocation in a homicide case); *United States v. Harpel*, 493 F.2d 346, 351 (10th Cir. 1974) (government must prove beyond a reasonable doubt that the contents of a wire or oral communication were acquired through a device other than a telephone used in the ordinary course of business); *United States v. McCann*, 465 F.2d 147, 162 (5th Cir. 1972), cert. denied, 412 U.S. 927, 93 S.Ct. 2747, 37 L.Ed.2d 154 (1973) (government not required to prove inapplicability of consent exception under § 2511). Indeed, in this case the fact to be proved, the purpose of the recording, has no relation to the act proscribed, the crime of perjury. Thus due process is not offended by requiring the defendant to shoulder the ultimate burden of proof under §§ 2511(2)(d) and 2515. *Nardone v. United States, supra,* 308 U.S. at 341, 60 S.Ct. 266.

■ It is clear however that a party seeking to suppress such matter must be given a full and fair opportunity to meet his or her burden of proof.[3] Our review of the record convinces us that defendant was

---

3. Our disposition does not relieve the government of its obligation under 18 U.S.C. § 3504(a)(1) to affirm or deny the occurrence of the alleged unlawful act. On remand, the trial judge should require the government to call the parties responsible for the interception and to establish a legal purpose for the interception. If this obligation is met, the defendant must prove, by a preponderance of the evidence, the existence of one of the exceptions listed in § 2511(2)(d). The risk of nonpersuasion shall remain with the defendant.

We do not decide on whom the burden rests when the defendant is prosecuted under § 2511(1)(a) and the subexception contained in § 2511(2)(d).

effectively denied this opportunity in the court below.

■ Because of pretrial discovery, this point was not raised until the eve of trial. Nevertheless, at that time the defendant filed his supplemental motion to suppress claiming that the conversation was recorded for a tortious purpose. The motion was orally raised the next morning in the trial judge's chambers. The motion was summarily denied before defense counsel was given any opportunity to make a statement or offer evidence in support of the motion. The trial judge expressed the view at this time that any such evidence would be admissible for impeachment purposes only. At trial, defense counsel attempted to pursue the subject with George Overton, manager of the Shangri La. The government objected to this line of questioning on the grounds of irrelevancy and the objection was sustained. Thus, the dearth of evidence on the issue,[4] which both parties acknowledge, was largely created by the unwillingness of the trial judge to allow defense counsel to pursue this line of inquiry. Under these circumstances, we find it necessary to remand to the district court for a hearing to determine the purpose for which the conversation was recorded. *See United States v. Rose*, 526 F.2d 745, 749–750 (8th Cir. 1975). If the recording was made for a legitimate purpose, the judgment of conviction must be reinstated. If, however, the defendant proves by a preponderance of the evidence that the recording was made for a criminal, tortious or other injurious purpose, the tape must be suppressed. If the tape is suppressed, a new trial will be necessary.[5]

## II. Jurisdiction and Materiality.

■ Defendant next contends that the questions asked of him were not material to any proper inquiry of the special grand jury. Since the questions were immaterial, he argues, the grand jury lacked jurisdiction and the government failed to prove an essential element of the offense.[6]

■ Under 18 U.S.C. § 1623, "* * a perjury conviction may not be based upon

---

4. In its opinion, the district court stated that the evidence showed that the recording was made by Davis and Overton for no other purpose than to protect their bargaining position with respect to any employment arrangement reached with Phillips. *United States v. Phillips*, No. 73–CR–38–W–3–D (W.D.Mo., filed April 10, 1975), slip op. at 15. We find no such evidence in the record. The evidence shows only that this was the purpose of the meeting. The evidence fails to disclose why Davis and Overton caused the meeting to be recorded.

5. We reject defendant's argument that the recording in question constituted a "tortious" invasion of his right of privacy under § 2511(2)(d). Under this theory, any interception, whether recorded for a legitimate purpose or not, would be unlawful and excluded. This is not the construction intended. *See Meredith v. Gavin*, 446 F.2d 794, 798–799 & n.5 (8th Cir. 1971). Furthermore, each willing participant in a conversation takes the risk that another participant may divulge the contents of that conversation. If the conversation is divulged, whether by memory of the participant or by electronic reproduction, there is no violation of any privacy right. *Cf. Rathbun v. United States*, 355 U.S. 107, 111, 78 S.Ct. 161, 2 L.Ed.2d 134 (1957); *Smith v. Cincinnati Post & Times-Star*, 475 F.2d 740, 741 (6th Cir. 1973). Except as set forth above, we express no opinion as to whether this recording was made "for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States *or of any State* or for the purpose of committing any other injurious act[,]" under § 2511(2)(d). (Emphasis supplied.) This determination must first be made by the trial court based on the evidence adduced by the parties and upon relevant federal and state laws.

We also reject the government's argument, based on *Meister v. Commissioner*, 504 F.2d 505, 508–511 (3d Cir. 1974), that the tape is independently admissible because the government had no part in the decision to record or the actual recording of the conversation. *Meister* emphasizes only that the fourth and fifth amendments proscribe government action, not private action. We are concerned here with a specific statutory directive that certain conversations which are electronically intercepted by private persons are not admissible in any official proceeding.

6. Materiality is essential to the jurisdiction of the grand jury. *See Brown v. United States*, 245 F.2d 549, 555 (8th Cir. 1957). Materiality is also an essential element of the crime of perjury under 18 U.S.C. § 1623. *See United States v. Lasater*, 535 F.2d 1041 (8th Cir. 1976), at 1047.

testimony not material to any proper inquiry of a grand jury." *United States v. Koonce*, 485 F.2d 374, 380 (8th Cir. 1973). Materiality is a question of law to be determined by the trial judge bearing in mind the broad investigatory powers of a grand jury to uncover violations of federal law. *Id. See also Masinia v. United States*, 296 F.2d 871, 874 (8th Cir. 1961); *Brown v. United States*, 245 F.2d 549, 554 (8th Cir. 1957). The burden of proving materiality, of course, rests with the government. *United States v. Koonce, supra*, 485 F.2d at 381. The criterion for determining materiality in this Circuit is whether or not the statements alleged to be perjurous tend to impede or hamper the course of the investigation by the grand jury. *United States v. Lasater*, 535 F.2d 1041 (8th Cir. 1976), at 1047; *United States v. Koonce, supra*, 485 F.2d at 380; *LaRocca v. United States*, 337 F.2d 39, 43 (8th Cir. 1964).

■■■ Defendant argues that the questions were not material because each related to matters of purely local (Oklahoma) concern and thus were not proper for consideration by a grand jury convened in Kansas City, Missouri. We disagree.

The grand jury transcripts admitted at trial show that the grand jury was investigating a conspiracy between certain Kansas City persons associated with organized crime and other persons affiliated with local nightclubs in northeastern Oklahoma. The purpose of the conspiracy was to establish illegal gambling, liquor and prostitution activities in Oklahoma. The method used to accomplish this objective was the corruption of local Oklahoma law enforcement officials. Interstate travel and communication were indisputable involved in the conspiracy.

Two of the central figures in the conspiracy were district attorney Grayson and Jess Roberts. Both individuals were connected to defendant Phillips during the course of the investigation. Testimony before the grand jury from various witnesses, including Grayson himself, established that Phillips had represented to others that he could "control" Grayson. Other testimony established that Phillips had represented cocon- spirator Roberts in regard to raids conducted against Roberts' club operation.

It is well settled that "* * * if a conspiracy is what the inquiry is directed at, the acts and conduct of the alleged conspirators that may have occurred in a district other than that where the grand jury is sitting may be gone into." *Brown v. United States, supra*, 245 F.2d at 554; *Masinia v. United States, supra*, 296 F.2d at 875. When Phillips was called before the grand jury, it was reasonably believed that certain actions on his part had interstate conspiracy implications. That the grand jury focused on conduct of Phillips which took place only in Oklahoma did not defeat its jurisdiction or render the questions immaterial.

■■■ Defendant also argues that the questions were not material because the prosecution and the grand jury had access to the tape and its contents before Phillips was called to testify. Again, we cannot agree.

The latitude of materiality with respect to questions asked of a witness during a grand jury investigation is quite broad. *United States v. Calandra*, 414 U.S. 338, 343–344, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); *United States v. Paolicelli*, 505 F.2d 971, 973 (4th Cir. 1974); *United States v. Stone*, 429 F.2d 138, 140 (2d Cir. 1970). As stated in the *Stone* case:

> * * * [M]ateriality of statements made in a grand jury investigation may more readily appear than that of similar evidence offered on an issue in civil or criminal litigation, since the purpose of the investigation is to get at facts which will enable the grand jury to determine whether formal charges should be made against someone rather than prove matters directly at issue. * * * Leads to further inquiry may be of material worth to an investigation.

*Id.* at 140; *see also United States v. Paolicelli, supra*, 505 F.2d at 973; *United States v. Lardieri*, 497 F.2d 317, 319 (3d Cir. 1974). A grand jury investigation is not carried out until every available clue has been run down and all witnesses have been properly

examined to discover whether a crime has been committed. *United States v. Calandra, supra,* 414 U.S. at 344, 94 S.Ct. 613, *quoting, United States v. Stone, supra,* 429 F.2d at 140.

Phillips' denials clearly frustrated the investigation of the grand jury. In pursuing its investigation with an open mind, the grand jury had to know the truth about Grayson's testimony respecting Phillips' statements that he could control Grayson. Phillips' testimony clouded that issue. Furthermore, Phillips' blanket denials frustrated possible inquiry into other areas such as possible connections between illegal operations at the Shangri La and persons associated with organized crime in Kansas City. By testifying that he could not put a fix on Grayson, Phillips frustrated any further fruitful investigation into legitimate matters before the grand jury. Therefore, we hold that the grand jury was acting within its jurisdiction when Phillips testified and that the questions asked of him were material to the investigation.

### III. The Literal Falsity of Defendant's Testimony.

▮▮▮▮▮ Defendant next argues that his testimony before the grand jury was not literally false under *Bronston v. United States,* 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973). He contends that the government's questions in regard to influence peddling were ambiguous and his responses thereto unresponsive and literally true. We disagree.

In *Bronston,* the Supreme Court reversed a perjury conviction because the defendant's answers, upon which the prosecution was based, were unresponsive to the questions asked and literally true. The Court held that a willful statement which merely *implies* a material matter known to the witness to be untrue does not constitute perjury. *Id.* at 357–358, 93 S.Ct. 595.

*Bronston* is plainly inapposite. In this case, the government's questions were clear and understandable, not prolix and ambiguous as defendant argues. Phillips' responses were unequivocal. Government counsel initially asked Phillips whether he had told anyone associated with any club that he could influence Grayson with respect to illegal operations. Phillips responded no. Thereafter, government counsel asked specifically whether defendant had made such representations to persons operating the Shangri La. Phillips again responded no.[7]

7. The grand jury transcript, at 77–89, reads as follows:

Q   Now, as you have seen today, I have been in and out of the room, unfortunately. I don't know if my associate here has covered all of these areas and I just hope you will excuse me if I am repetitious, but I would like to ask you a summary question, whether or not you have ever suggested, represented or any words to that effect to any person that you had the power to influence any public official with respect to gambling or prostitution activities?

A   No. No. Absolutely not.

Q   Now, we have reason to believe that certain Kansas City hoodlum figures, persons associated with the criminal element in the Kansas City area, are attempting or have attempted to establish gambling, prostitution, illegal liquor and other illegal activities in Oklahoma. We know and have documented that certain of these Kansas City hoodlums have visited Oklahoma and that they visited and talked with and perhaps had business dealings with a number of the club operators down there, which would include Jess Roberts, Jack King, people at the Shangri-la, possibly others. We are interested and are very eager to determine whether or not these persons may have talked with the local operators down there about how they could secure protection when they moved their illegal activities in or when they began engaging in illegal activities.

A   I—

Q   Consequently it's very important for us to know if you have ever had discussions with anyone, particularly persons who are associated with private clubs of any kind, and I mean private clubs or country clubs or the Shangri-la or any activity of that sort, in which you have represented that you had the power to influence the action of public officials with respect to prostitution, narcotics—excuse me, I didn't mean to say narcotics—

A   Well, I want you to put narcotics in there.

Q   All right, whether or not you have ever indicated to any person associated with any private club operation of any nature, including country clubs or the Shangri-la or

Our independent review of the tape recording indicates that Phillips' answers were literally false. The tape contains the following colloquy between Phillips, Overton and Davis:

O: Well, here I was gonna ask a direct question. (Pause) Can I go back—you said this project, now there is another major area that I can see that there might be problems in and there might not and we, the three of us sitting here, recognize the operation of our club as a potential problem. Now, could we, can we, depend on Fred Phillips . . .

P: I can, I can control Frank.

O: . . . to help us in that area without, ah, let's just putting as Mr. Davis said a while ago, just putting our cards on the table, without having say to come up with another legal fee for that. Ah, in the next twelve months or whatever, you know, reasonable period . . .

P: Now, there you're getting into politics there and the only thing you get in trouble on that is if it would be down state where I'd have, have advance notice of any kind of problems, if they was getting a kick, out of a kick, from some of the local people. You do it, other people's gonna want to do it. They can't. In other words, it's got to be this place and only this place, if you do what you want done and then, course, Frank's gonna take the heat. Well, he's locked in here for four years and I think you know—you've heard the stories that I ran Frank and he wasn't even here.

O: He was a resident up in or—not a resident . . .

P: Yeah, he was registered here, had residence here, but it was hell, he was clear out, back East someplace and this was something had to be done. But I don't mean to be, blow things out of perspective, you know, that I'm bigger than I am. I know I'm not. But I know what I can do and it won't make me mad a bit. In other words if you don't want to go on the deal, fine. But I mean what I'll earn every dime I make from it. I mean that, you pay me, I know that, Mr. Davis.

This discussion was followed by representations of Phillips that the Shangri La could conduct illegal gambling operations on a limited basis.

At trial, Phillips repeatedly admitted the accuracy of the contents of the tape. We agree with the district court's determination that the defendant's testimony before the grand jury was not only responsive but literally false. *See United States v. Parr*, 516 F.2d 458, 470 (5th Cir. 1975); *United States v. Paolicelli, supra*, 505 F.2d at 973; *United States v. Nickels*, 502 F.2d 1173,

any others, that you had the power to influence any public official with respect to prostitution, narcotics, liquor or gambling activities?

A No, sir, I have never ever just carte blanche.

The questioning then focused on the Shangri La:

Q Now, pursuing our original line of questioning, we also have indications that we have satisfied ourselves that a number of these Kansas City People visited the Shangri-la on at least one and possibly more occasions and conducted some rather elaborate business discussions or meetings there, and can you tell us whether or not you have ever had any discussion with any of the owners or operators, and I know there was a George Overton—

A George Overton.

\* \* \* \* \* \*

Q Not to affect law enforcement with respect to the liquor or gambling, prostitution or narcotics, right?

A Yes.

Q She has to get an audible answer.

A I did not make a statement that he could in any way.

Q Right. To rephrase the question, the conversations which you had with any representatives of the Shangri-la were never to the effect that you could furnish any protection from local law enforcement authorities.

A No. No.

1178 (7th Cir. 1974), *appeal docketed,* —— U.S. ——, 96 S.Ct. 2237, 48 L.Ed.2d 837 (1975) (No. 74–735); *United States v. Isaacs,* 493 F.2d 1124, 1155 (7th Cir.), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3184, 41 L.Ed.2d 1146 (1974).

## IV. Miranda Rights.

Phillips also argues that the tape recording should have been suppressed because he was not admonished of his *Miranda* rights when called before the grand jury. Relying heavily on *United States v. Mandujano,* 496 F.2d 1050 (5th Cir. 1974), he claims that because the investigation had focused on him as a virtual or putative defendant, he was entitled to the *Miranda* litany.

We note initially that defendant's suppression motion in this respect was misdirected. Even assuming error under *Miranda,* the grand jury testimony, not the tape recording, was the fruit of such error. Thus, only the grand jury testimony would require suppression in any event. Construing defendant's motion broadly however, we proceed to discuss the merits of the *Miranda* question.

The Supreme Court has recently reversed the *Mandujano* case, the authority upon which defendant principally relies, holding unanimously that *Miranda* rights are not required in the grand jury context. *United States v. Mandujano,* —— U.S. ——, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1976) (No. 74–754). In a plurality opinion in which three members of the Court joined, Chief Justice Burger carefully distinguished between custodial interrogation, to which *Miranda* was addressed, and interrogation before a grand jury, which is involved in this case.

> The Court [in *Miranda*] thus recognized that many official investigations, such as grand jury questioning, take place in a setting wholly different from custodial police interrogation. * * * To extend these concepts to questioning before a grand jury inquiring into criminal activity under the guidance of a judge is an extravagant expansion never

remotely contemplated by this Court in *Miranda;* the dynamics of constitutional interpretation do not compel constant extension of every doctrine announced by the Court. (Citations omitted.)

*Id.* at ——, 96 S.Ct. at 1778, at 4634. The plurality concluded that even if the defendant was a putative defendant before the grand jury, that fact had no bearing on the validity of a conviction for testifying falsely. *Id.* —— U.S. at ——, 96 S.Ct. 1768.

Mr. Justice Stewart, in a concurring opinion in which Mr. Justice Blackmun joined, stated the following:

> The Fifth Amendment privilege against compulsory self-incrimination provides no protection for the commission of perjury. "Our legal system provides methods for challenging the Government's right to ask questions—lying is not one of them. A citizen may decline to answer the question, or answer it honestly, but he cannot with impunity knowingly and willfully answer with a falsehood." (Citations omitted.)

*Id.* at ——, 96 S.Ct. at 1792, at 4643.

We hold that the failure of the prosecutor to admonish Phillips of his *Miranda* rights did not violate defendant's privilege against self-incrimination. Phillips was under oath to tell the truth before the grand jury. When he proffered false answers, " * * * he took 'a course that the Fifth Amendment gave him no privilege to take.'" *Id.* —— U.S. at ——, 96 S.Ct. at 1780, *quoting United States v. Knox,* 396 U.S. 77, 82, 90 S.Ct. 363, 24 L.Ed.2d 275 (1969) (Mr. Justice Brennan, concurring). It is true that the prosecutor failed to inform Phillips of his right against self-incrimination as well as his other *Miranda* rights. But it would be incredible to assume that defendant, a practicing attorney of many years, a former assistant county attorney, an Oklahoma state senator and former county judge, was not aware of his *Miranda* rights when he testified before the grand jury. *See Cargill v. United States,* 381 F.2d 849, 853 (10th Cir. 1967), *cert. denied,* 389 U.S. 1041, 88 S.Ct. 781, 19

L.Ed.2d 831 (1968). Phillips' decision to proffer false answers was in no way compelled; it was a voluntary decision on his part.[8]

*V. The Remaining Contentions.*

Defendant asserts several other points of error. We briefly discuss these points finding each to be without merit.

Phillips argues that the district court erred in denying his motions for directed acquittal at the conclusion of the government's case and at the close of all the evidence. Phillips' representations to Davis and Overton contained in the tape, coupled with his testimony before the grand jury, clearly constituted a submissible case of perjury for the jury.

■ Phillips argues that successor Judge Hunter abused his discretion in refusing to grant a new trial after the untimely death of Judge Duncan. Under such circumstances, the decision to grant a new trial is a matter committed to the sound discretion of the successor judge. *See* Fed. R.Crim.P. 25(b); *Connelly v. United States,* 249 F.2d 576, 579 (8th Cir. 1957). We refuse to disturb that discretion here. This is not an exceedingly complicated case. Our review of Judge Hunter's opinion convinces us that he adequately familiarized himself with the evidence and legal issues involved and fairly resolved defendant's post-trial motions.

■ Defendant also argues that the district court erred in excusing the jury during its deliberations. The record indicates that after deliberating for nearly two hours, certain members of the jury expressed concern for the safety of their cars which were parked in various garages surrounding the courthouse. Accordingly, the trial judge allowed the jury to separate in order to move their cars and eat dinner. We find no error in this regard. Whether members of the jury are allowed to separate is a matter resting squarely within the discretion of the trial judge. *Koolish v. United States,* 340 F.2d 513, 528 (8th Cir.), *cert. denied,* 381 U.S. 951, 85 S.Ct. 1805, 14 L.Ed.2d 724 (1965); *Hines v. United States,* 365 F.2d 649, 651 (10th Cir. 1966). Defendant has not alleged nor shown any prejudice resulting from this short separation.

■ Lastly, defendant argues that the trial judge erred in failing to inform defense counsel that he intended to instruct the jury that the tape recording was legally admissible into evidence. Defendant contends this failure prejudicially hampered his closing argument. This claim is frivolous. The question of admissibility of the tape was a legal question to be resolved by the trial judge, not the jury. Defense counsel was repeatedly told throughout trial that the tape recording would be admitted.

The judgment of conviction is vacated, and the cause is remanded for further proceedings not inconsistent with the views expressed in this opinion.

---

**8.** Defendant implies that the sole purpose of calling him before the grand jury was to entrap him into committing perjury. We reject this argument since any troubles caused defendant were brought upon by himself. Phillips was warned that he was a potential defendant. Grand Jury Transcript at 4. The government did not solicit Phillips to commit perjury. At most a situation was created where perjury appeared expedient. There is nothing in this record even remotely suggesting any prosecutorial misconduct which would require a finding of entrapment. *See United States v. Nickels,* 502 F.2d 1173, 1176 (7th Cir. 1974), *appeal docketed,* —— U.S. ——, 96 S.Ct. 2237, 48 L.Ed.2d 837 (1975) (No. 74–735); *LaRocca v. United States,* 337 F.2d 39, 42–43 (8th Cir. 1964).