731 F.2d 1123
 UNITED STATES of America, Appellee,
v.
Joseph Vincent TRUGLIO, Appellant. (Two cases)
UNITED STATES of America, Appellee,
v.
Phillip PAVILACK, Appellant.
UNITED STATES of America, Appellee,
v.
Roberta Mae EBRIGHT, Appellant.
UNITED STATES of America, Appellee,
v.
Florence HESS, Appellant.
 Nos. 83-5103, 83-5104, 83-5115 to 83-5117, 83-5119 and 83-5120.
 United States Court of Appeals,
Fourth Circuit.
 Argued Jan. 11, 1984.
Decided April 5, 1984.
 
 Thomas A. Livingston, Pittsburgh, Pa., for appellant Truglio.
 Robert P. Fitzsimmons, Wheeling, W.Va., for appellant Ebright.
 Jacob M. Robinson, Wheeling, W.Va., for appellant Hess.
 David J. Joel, Wheeling, W.Va., for appellant Pavilack.
 Thomas O. Mucklow, Asst. U.S. Atty., Wheeling, W.Va., Richard M. Yurko, Third Year Law Student (William A. Kolibash, U.S. Atty., Wheeling, W.Va., on brief), for appellee.
 Before WINTER, Chief Judge, and MURNAGHAN and SPROUSE, Circuit Judges.
 MURNAGHAN, Circuit Judge:
 
 
 1
 Joseph Vincent Truglio, Florence Hess, Roberta Mae Ebright and Phillip Pavilack appeal from their convictions arising from their participation, in varying manners and degrees, in the operation and management of the King of the Road Health Spa, a house of prostitution in Wheeling, West Virginia.
 
 
 2
 Truglio, Hess, Ebright and Pavilack were indicted on November 19, 1982. In a twenty-five count indictment, appellants were charged with numerous violations of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. Sec. 1962(c) and (d)),[1] the Travel Act (18 U.S.C. Sec. 1952(a)(3)),[2] and the Mann Act (18 U.S.C. Sec. 2422)).[3] Truglio was also indicted for two alleged violations of 18 U.S.C. Sec. 2511(1)(a).[4] The indictments covered activities of the appellants from March 11, 1980 to November 19, 1982.
 
 
 3
 Truglio owned and operated the King of the Road Health Spa located in Wheeling, West Virginia. Pavilack was described in the indictment as "a courier ... [who] assisted in the operation of the King of the Road Health Spa." Ebright and Hess were each described as "a manager at the King of the Road Health Spa" who "assisted in its operation."
 
 
 4
 The parties stipulated that prostitution was ongoing at the King of the Road. Testimony at trial showed that the prostitutes traveled to past residences on off-days or vacations. With respect to travel from outside the state to Wheeling, the evidence demonstrated that many of the prostitutes traveled from other states to work at the King of the Road. No evidence was presented at trial to indicate that the travel occurred for any reason other than prostitution.
 
 
 5
 The managerial nature of the roles of Ebright and Hess was exemplified by the testimony of Carmen Micha Jacobs, a prostitute at the King of the Road. When asked how she came to be employed at the establishment, Jacobs testified that she had met "a girl named Gypsy" who had provided her with a phone number. Jacobs called the phone number and spoke with Hess, who told her to call back. Instead, Ebright called Jacobs and told her that she "could come in."
 
 
 6
 Pavilack is referred to by the parties as a "courier," "go-fer," and "taxi-driver." Upon notification by either Hess or Ebright, Pavilack would transport women from the nearby Holiday Inn in Wheeling, West Virginia, where they had appeared, or transport them back to the Holiday Inn, where they would wait to travel, in some cases, to other states. Pavilack also took the women to and from the doctor's office on Wednesdays for their examinations. His further duties included the buying of groceries for the women, since most of them lived at the King of the Road when they were in Wheeling. Finally, witness Hickman, a prostitute, testified that she had paid rent to Pavilack so that she would have an address in Wheeling.
 
 
 7
 The women paid Pavilack directly for his courier services at the rate of five dollars per person. He was not in any way paid by the enterprise for his services. FBI surveillance teams observed Pavilack and the King of the Road for approximately two years, yet never saw him participating in other activities. No one ever saw him transport a woman across the state line.
 
 
 8
 On June 19, 1982, pursuant to a warrant issued by the district court, federal law enforcement officials conducted a search of the Truglio's residence. The warrant allowed seizure of:
 
 
 9
 currency, books, records, indices, movies regarding the interstate prostitution operation located at the King of the Road Health Club ..., and also controlled substance and paraphernalia relating thereto ...
 
 
 10
 During the search, the agents seized an extensive array of items, including eight audio cassettes, discovered in the kitchen cupboard.
 
 
 11
 The agent in charge of the search later testified that he did not listen to the cassettes while on the premises, and did not know what they were at the time of seizure. He first listened to the tapes "back in the office." The district court denied Truglio's pre-trial motion to suppress. Three of the eight cassettes were ultimately introduced into evidence and played for the jury.
 
 
 12
 The district court also denied pre-trial motions from all defendants for a change of venue within the district. The change of venue motion concerned the district court's decision to hold the trial in Clarksburg, rather than Wheeling, West Virginia, both of which are located in the Northern District of West Virginia. All of the defendants and defense witnesses resided in Wheeling. Three of the four defense attorneys resided in Wheeling, with the fourth only sixty miles away.
 
 
 13
 The district court nonetheless decided to hold the trial in Clarksburg, one hundred and twenty-two miles, and three hours' driving time from Wheeling. The judge based his decision on the fact that he had just moved from the Southern District of West Virginia, and, while he had managed to set up his Clarksburg office, he had yet to do so in Wheeling. Fearing that it would be too difficult to preside over the trial at the same time as he was trying to set up his facilities and get his support staff in working order, he denied the motion for a change of venue.
 
 
 14
 The nine-day jury trial, in Clarksburg, began on March 24, 1983. All four appellants were found guilty of the two alleged RICO violations. Truglio and Pavilack were found guilty of three Mann Act violations. As for the Travel Act, Truglio was convicted of twelve violations, Hess of nine, Ebright of seven, and Pavilack of four.
 
 
 15
 On May 10, 1983 appellants were sentenced. Truglio received two concurrent twenty-year sentences and a $20,000.00 fine for the RICO counts. He received an additional five-year sentence and $2,000.00 fine for each of the remaining fifteen counts. The five-year sentences were to run concurrently with each other, but consecutively to the RICO punishments.[5] Hess, Ebright and Pavilack received concurrent five-year sentences and fines of $1,000.00 for each of the counts of which they were convicted.
 
 
 16
 On appeal, the parties raise twenty-four issues. After consideration of the briefs and record, we find the majority of the claims to be without merit, and summarily affirm.[6] We restrict our discussion to the remaining issues, which, in our view, merit closer consideration.
 
 I.
 
 17
 We first consider Appellant Truglio's contention that the district court erred in failing to suppress the audio cassettes seized from the kitchen cabinet. Truglio argues that to allow a search warrant referring to "records" to reach audio cassettes, would be to sanction an impermissible, exploratory search. He argues further, that, since the items to be seized were books, the seizure involves both Fourth Amendment and First Amendment considerations. Thus, he argues, the adequacy of the search warrant must be measured by an extremely stringent test of specificity.
 
 
 18
 Contrary to Truglio's assertion, the seizure of the audio cassettes does not involve First Amendment considerations. The warrant authorized seizure of items including "... books, records ...." Not all books, however, are automatically deserving of First Amendment protections in this context. Instead, "the constitutional requirement that warrants must particularly describe the 'things to be seized' is to be accorded the most scrupulous exactitude when the 'things' are books, and the basis for their seizure is the ideas they contain." Stanford v. Texas, 379 U.S. 476, 485, 85 S.Ct. 506, 511, 13 L.Ed.2d 431 (1965) (emphasis supplied, citations omitted).
 
 
 19
 The word "books" in the context of a phrase like "books and records" has, of course, a quite different meaning. A "book" which is no more than a ledger of an unlawful enterprise thus might stand on a quite different constitutional footing from the books involved in the present case.
 
 
 20
 Id. at 485, n. 16, 85 S.Ct. at 512, n. 16. Unlike in Stanford, supra, the books and records to be seized from Truglio were not to be seized for the ideas they contained. "The items named in this warrant were evidentiary materials, and their seizure did not threaten to deprive the public of access to protected material." United States v. Jacobs, 513 F.2d 564, 567 n. 3 (9th Cir.1975).[7]
 
 
 21
 Since the records at issue do not implicate the First Amendment,
 
 
 22
 the test for the necessary particularity is a pragmatic one: "The degree of specificity required when describing the goods to be seized may necessarily vary according to the circumstances and type of items involved ... [T]here is a practical margin of flexibility permitted by the constitutional requirement for particularity in the description of items to be seized." United States v. Davis, 542 F.2d 743, 745 (8th Cir.1976).
 
 
 23
 United States v. Torch, 609 F.2d 1088, 1090 (4th Cir.1979), cert. denied, 446 U.S. 957, 100 S.Ct. 2928, 64 L.Ed.2d 815 (1980). Accord, United States v. Espinoza, 641 F.2d 153, 165 (4th Cir.1981), cert. denied, 454 U.S. 841, 102 S.Ct. 153, 70 L.Ed.2d 125 (1981). See also United States v. Cortellesso, 601 F.2d 28, 32 (1st Cir.1979), cert. denied, 444 U.S. 1072, 100 S.Ct. 1016, 62 L.Ed.2d 753 (1980) ("... warrants are to be tested 'in a commonsense and realistic fashion' and not in a hypertechnical manner [citation omitted].").
 
 
 24
 It is against standards of pragmatism and commonsense that we must measure Truglio's contention that the word "records" should be limited to refer solely to written records. Admittedly, it would have been more precise for the warrant to have specified "written or electronic records."[8] Nonetheless, the failure to specify the nature of the records should not render the warrant fatally defective.
 
 
 25
 Standards of pragmatism and commonsense must necessarily be adaptable to changing times and technological advances. While decades ago it might have been difficult reasonably to infer that records existed in some form other than written, in the mid-1980's commonsense demands that we refrain from remaining so inflexible. By way of analogy, we refer to the Advisory Committee Notes to Federal Rule of Evidence 1001(1) which defines "Writings and recordings:"[9]
 
 
 26
 Present day techniques have expanded methods of storing data; yet the essential form which the information ultimately assumes for usable purposes is words and figures. Hence the considerations underlying the rule dictate its expansion to include computers, photographic systems, and other modern developments.
 
 
 27
 Since the audio cassettes fit the description of "records" within a practical margin of flexibility, the seizure of the cassettes did not violate Truglio's Fourth Amendment rights.
 
 II.
 
 28
 All four appellants next contend that the imposition of sentences under both RICO and the Travel Act amounts to a violation of their rights under the Double Jeopardy Clause of the Fifth Amendment. Appellants rely on Blockburger v. United States, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932), which announced:The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.
 
 
 29
 Appellants then observe that the Travel Act offenses are the predicate offenses of the RICO violations, and that all the facts necessary to sustain the Travel Act convictions were also necessary to sustain the RICO convictions.
 
 
 30
 The foregoing arguments ignore the Supreme Court's recent applications of the Blockburger rule. The Supreme Court has repeatedly emphasized that the Blockburger rule is a rule of statutory construction. Missouri v. Hunter, 459 U.S. 359, 366, 103 S.Ct. 673, 678, 74 L.Ed.2d 535 (1983); Albernaz v. United States, 450 U.S. 333, 337, 101 S.Ct. 1137, 1141, 67 L.Ed.2d 275 (1981); Whalen v. United States, 445 U.S. 684, 691, 100 S.Ct. 1432, 1437, 63 L.Ed.2d 715 (1980). In Whalen v. United States, supra, the Court considered whether cumulative punishments for the offenses of rape and killing the same victim in perpetration of the rape violated the Blockburger rule. The Court, however, emphasized an important qualification of the rule:
 
 
 31
 [W]here the offenses are the same ... cumulative sentences are not permitted, unless elsewhere specially authorized by Congress.
 
 
 32
 Id. at 693, 100 S.Ct. at 1438. Finding no clear indication of contrary legislative intent, the Court held that cumulative punishment could not be imposed under the two statutes.
 
 
 33
 The following term, the court addressed the question of whether a defendant could be cumulatively punished in a single trial for conspiracy to import marijuana and conspiracy to distribute marijuana. Albernaz v. United States, 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981). After initially concluding that each provision required proof of a fact that the other did not, the Court added:
 
 
 34
 [T]he question of what punishments are constitutionally permissible is no different from the question of what punishment the Legislative Branch intended to be imposed. Where Congress intended, as it did here, to impose multiple punishments, imposition of such sentences does not violate the Constitution.
 
 
 35
 Id. at 344, 101 S.Ct. at 1145.
 
 
 36
 Finally, in Missouri v. Hunter, supra, the Court considered whether a defendant could be punished for violations of Missouri's first-degree robbery statute and also its armed criminal action statute. Observing that the Missouri Supreme Court had recognized that the Missouri legislature had intended that punishment for violations of the statutes be cumulative, the Court held that the imposition of multiple punishments was permissible under the reasoning of Whalen and Albernaz. The Court concluded:
 
 
 37
 Where, as here, a legislature specifically authorizes cumulative punishment under two statutes, regardless of whether those two statutes proscribe the "same" conduct under Blockburger, a court's task of statutory construction is at an end and the prosecutor may seek and the trial court or jury may impose cumulative punishment under such statutes in a single trial.
 
 
 38
 Id. 459 U.S. at 368-69, 103 S.Ct. at 679.
 
 
 39
 Our only task, therefore, is to ascertain whether the legislature specifically has authorized cumulative punishment under RICO and the Travel Act. We agree with the Sixth Circuit that
 
 
 40
 [t]he clear legislative intent expressed concurrently with the enactment of RICO is to permit, perhaps even to encourage, courts to impose cumulative sentences for RICO offenses and the underlying crimes.
 
 
 41
 United States v. Sutton, 700 F.2d 1078, 1081 (6th Cir.1983) (cumulative sentences imposed for RICO offenses and predicate drug trafficking offenses). The Sutton Court buttressed its conclusion by referring to the congressional purpose in enacting RICO, which in part sought to provide "enhanced sanctions" to deal with organized crime, and emphasized that nothing in RICO was to supersede "any provision of Federal ... law imposing criminal penalties ... in addition to those provided for" in RICO. Id. at 1080-81.[10] Missouri v. Hunter, supra, Albernaz v. United States, supra, and Whalen v. United States, supra, compel the conclusion that the imposition of cumulative sentences for RICO and Travel Act violations did not offend the Double Jeopardy Clause.
 
 III.
 
 42
 All four appellants also renew their challenge to the district court's decision to hold the trial in Clarksburg, rather than Wheeling, West Virginia. As noted earlier, all four defendants, all defense witnesses, and three of the four defense attorneys resided in Wheeling. Appellants rely on United States v. Fernandez, 480 F.2d 726 (2nd Cir.1973), where the district court held the trial in Westbury, rather than Brooklyn, New York. The Second Circuit reversed the denial of the motion for change of venue, observing that "the only person convenienced by trial at Westbury was the judge." Id. at 730. The Court could not find the "slightest indication why 'interests of justice' " required that the trial be held in Westbury. Id.
 
 
 43
 Wheeling and Clarksburg are both in the Northern District of West Virginia. Appellants therefore "had no constitutional or statutory right to venue" in Wheeling. United States v. Florence, 456 F.2d 46, 50 (4th Cir.1972); United States v. Fernandez, supra, at 730. The decision to hold the trial in Clarksburg was an exercise of the sound discretion of the district judge. Fed.R.Crim.P. 18 ("The court shall fix the place of trial within the district with due regard to the convenience of the defendant and the witnesses and the prompt administration of justice."); United States v. Florence, supra, at 50.
 
 
 44
 Although we are not untroubled by the district court's decision, we cannot conclude that the court abused its discretion. The district judge based his decision on the fact that he had not yet set up his offices in Wheeling. He sought to avoid the difficulties of presiding over a complicated trial at a location where he had not yet set up his office, and where he might well face difficulties when he sought to do so.[11]
 
 
 45
 Although the considerations arose from the predicament of the judge, it does not follow that the only person convenienced by the decision was the judge. Had the district judge attempted to hold the trial in a location in which he lacked the requisite facilities and support staff, his very ability to preside adequately over such a complex trial might have been jeopardized. Also, the conduct of other matters pending before the court and requiring attention during the same time span as the trial might have suffered if the judge were compelled to function in the unestablished Wheeling quarters. The concerns reach beyond mere convenience and implicate fundamental interests of justice. It was for the district court to balance the competing concerns with respect to venue, and, finding no abuse of discretion, we will not disturb his decision.[12]IV.
 
 
 46
 Appellant Hess contends that the district court erred in admitting a tape recording, made by Truglio, of a telephone conversation between Hess and Truglio. She argues that 18 U.S.C. Sec. 2511 proscribes clandestine interception of telephone conversations and that Truglio has already pled guilty to violations of that act. She contends further that the government failed to prove that either Hess or Truglio consented to the interception, and that the tape recordings were obviously related to the illegal activities. Therefore, she argues, the tapes should have been inadmissible under 18 U.S.C. Sec. 2515.[13]
 
 
 47
 Her argument not only reveals a fundamental misreading of the statute, but also contains misleading contentions and dubious inferences. 18 U.S.C. Sec. 2511, which describes the breadth of the prohibition against such interceptions, contains the following exception in Sec. 2511(2):
 
 
 48
 (d) It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire or oral communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State or for the purpose of committing any other injurious act.
 
 
 49
 (Emphasis supplied). Under the plain language of the statute, the government's alleged failure to prove that either Hess or Truglio consented to the interception is irrelevant since the exception also applies where the interceptor--Truglio here--is a party to the communication.
 
 
 50
 The communication was admissible, then, unless it was intercepted "for the purpose of committing any criminal or tortious act...." Sec. 2511(2)(d). Contrary to Hess' implications, it is the interception itself, not the conversation, that must be for the purpose of committing the criminal or tortious act. See e.g. Meredith v. Gavin, 446 F.2d 794, 799 (8th Cir.1971); United States v. Phillips, 540 F.2d 319, 325 (8th Cir.1976), cert. denied, 429 U.S. 1000, 97 S.Ct. 530, 50 L.Ed.2d 611 (1976); Moore v. Telfon Communications Corporation, 589 F.2d 959, 965 (9th Cir.1978).[14] That the conversations presumably related to prostitution or gambling is irrelevant. That Truglio pleaded guilty to two counts of alleged Sec. 2511 violations is both misleading and irrelevant; the recordings objected to by Hess were not the basis of the counts to which Truglio pled guilty.
 
 
 51
 The issue then becomes whether Hess has met her burden of proving, by a preponderance of the evidence, that the tape recordings were made for the purpose of committing a criminal or tortious act. United States v. Traficant, 558 F.Supp. 996, 1000 (N.D.Ohio 1983), citing United States v. Phillips, supra, at 326 n. 3, 327. Appellant Hess has proffered no explanation as to how the interception itself was made for such an improper purpose. The district court based its denial of the motion to suppress "upon the reasoning of the district court in United States v. Traficant,"[15] supra, which held that defendant had not carried his burden of proof. We conclude that the implied finding of the district court was not clearly erroneous, and affirm.
 
 V.
 
 52
 Finally, we consider Appellant Pavilack's contention that the evidence against him was insufficient to sustain any of his convictions. As noted previously, Pavilack was convicted of three violations of the Mann Act, and four violations of the Travel Act. He was also convicted of two RICO violations, a substantive violation under Sec. 1962(c), and a conspiracy violation under Sec. 1962(d).
 
 
 53
 The government proved no more than that Pavilack was a courier and "go-fer". His activities consisted of transporting the women between the King of the Road and the Holiday Inn or the doctor's office, both also in West Virginia; he also purchased groceries for the women. Pavilack, however, operated as an independent operator, paid directly by the women. The government failed to prove that he was paid by the enterprise for his services or that he transported women across State lines.
 
 
 54
 The evidence is insufficient to sustain the Mann Act convictions. The Mann Act addresses "[w]hoever knowingly persuades, induces, entices or coerces any woman or girl to go from one place to another in interstate or foreign commerce...." 18 U.S.C. Sec. 2422. "[T]he requisite inducement is any offer sufficient to cause the woman to respond...." Harms v. United States, 272 F.2d 478, 481 (4th Cir.1959). At most, the evidence revealed that Pavilack transported women who would subsequently, or had recently, crossed state lines. The record is completely devoid of any evidence indicating that Pavilack extended the requisite inducement or offer. We therefore reverse the Mann Act convictions.[16]
 
 
 55
 We reach the same result with respect to the substantive RICO count, and the four Travel Act counts. 18 U.S.C. Sec. 1952 specifically addresses: "Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce." The government offered no evidence that Pavilack transported women across state lines. Nor may we infer from his status as a mere taxi-driver that he used any facility in interstate commerce to "promote, manage, establish, carry on or facilitate the promotion, management, establishment, or carrying on," of the illegal enterprise. 18 U.S.C. Sec. 1952(a)(3). The Travel Act convictions therefore must be reversed.
 
 
 56
 As for the substantive RICO count, since we find the evidence insufficient to sustain the Travel Act convictions, and since those offenses were the predicate offenses of the substantive RICO count, the evidence is similarly insufficient with respect to that count. Section 1962(c) deems it unlawful "for any person employed by or associated with" an enterprise engaged in interstate or foreign commerce, to conduct or participate in the enterprise's affairs "through a pattern of racketeering activity...." The government has proved at most that Pavilack was associated with the enterprise; it has not demonstrated, beyond reasonable doubt, that the participation was through a pattern of racketeering activity.
 
 
 57
 There remains, however, Pavilack's conviction under the RICO conspiracy count. 18 U.S.C. Sec. 1962(d).
 
 
 58
 Appellate review of conspiracy convictions has generally been a two-step process: first, to determine whether the evidence is sufficient to show that a conspiracy existed; second, to consider which, if any, of the appellants were shown to be members thereof.
 
 
 59
 United States v. Morado, 454 F.2d 167, 174 (5th Cir.1972), cert. denied, 406 U.S. 917, 92 S.Ct. 1767, 32 L.Ed.2d 116 (1972). As to the first step, the evidence is overwhelming that such a conspiracy did exist.[17] Without further discussion, we therefore pass to consideration of Pavilack's association with the conspiracy.
 
 
 60
 To prove that Pavilack was a member of the conspiracy,
 
 
 61
 the government need only show "slight evidence" that a particular person was a member of a conspiracy once the conspiracy itself is established.
 
 
 62
 United States v. Morado, supra, at 175.
 
 
 63
 Undeniably, then, under the RICO conspiracy provision, remote associates of an enterprise may be convicted as conspirators on the basis of purely circumstantial evidence.
 
 
 64
 United States v. Elliott, supra, at 903.
 
 
 65
 To be convicted as a member of an enterprise conspiracy, an individual, by his words or actions, must have objectively manifested an agreement to participate, directly or indirectly, in the affairs of an enterprise through the commission of two or more predicate crimes.
 
 
 66
 Id. at 903 (emphasis in original). Accord, United States v. Karas, 624 F.2d 500, 503 (4th Cir.1980), cert. denied, 449 U.S. 1078, 101 S.Ct. 857, 66 L.Ed.2d 800 (1981).
 
 
 67
 It is well established that "[t]he government is not required to prove that a conspirator had full knowledge of all the details of the conspiracy; knowledge of the essential nature of the plan is sufficient."
 
 
 68
 United States v. Elliott, supra, at 903, quoting United States v. Brasseaux, 509 F.2d 157, 160 n. 3 (5th Cir.1975).
 
 
 69
 Under the principles enunciated, there was sufficient evidence to convict Pavilack of having violated Sec. 1962(d). Regardless of his knowledge of the full extent of the operation, he certainly was aware of the ongoing activities at the King of the Road. Regardless of his status as an independent contractor, he frequently acted to transport the women and run errands for them. The circumstantial evidence satisfied the "slight evidence" standard, and sufficiently established that Pavilack, by his actions, manifested an agreement to participate in the affairs of the enterprise. We therefore affirm his conviction under Sec. 1962(d).
 
 VI.
 
 70
 For the foregoing reasons, we reverse the convictions of Pavilack under the Mann Act, the Travel Act, and the substantive RICO count. We affirm his conviction under the RICO conspiracy charge. We also affirm with respect to each and every other objection raised by appellants on appeal.
 
 
 71
 AFFIRMED IN PART; REVERSED IN PART.
 
 
 
 [1]
 Sec. 1962. Prohibited activities
 (a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in or the activities of which affect, interstate or foreign commerce....
 (b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.
 (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.
 (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.
 
 
 [2]
 Sec. 1952. Interstate and foreign travel or transportation in aid of racketeering enterprises
 (a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to--
 * * *
 (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,
 and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.
 
 
 [3]
 Sec. 2422. Coercion or enticement of female
 Whoever knowingly persuades, induces, entices, or coerces any woman or girl to go from one place to another in interstate or foreign commerce, or in the District of Columbia, or in any Territory or Possession of the United States, for the purpose of prostitution or debauchery, or for any other immoral purpose, or with the intent and purpose on the part of such person that such woman or girl shall engage in the practice of prostitution or debauchery, or any other immoral practice, whether with or without her consent, and thereby knowingly causes such woman or girl to go and to be carried or transported as a passenger upon the line or route of any common carrier or carriers in interstate or foreign commerce, or in the District of Columbia or in any Territory or Possession of the United States, shall be fined not more than $5,000 or imprisoned not more than five years, or both.
 
 
 [4]
 Sec. 2511. Interception and disclosure of wire or oral communications prohibited
 (1) Except as otherwise specifically provided in this chapter any person who--
 (a) willfully intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire or oral communication; ...
 shall be fined not more than $10,000 or imprisoned not more than five years, or both.
 
 
 [5]
 That same day, Truglio entered a conditional plea, pending appeal, with respect to the alleged violations of 18 U.S.C. Sec. 2511(1)(a), for which he received a suspended five-year sentence
 
 
 [6]
 We affirm summarily the claims relating to the severity of Truglio's sentence, the sufficiency of the evidence for Truglio's Mann Act conviction, thirteen evidentiary issues, two instances of alleged gender-based discrimination, and the forfeiture of income and property under RICO
 
 
 [7]
 For these reasons, we find inapposite Stanley v. Georgia, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969). The majority there ruled that Georiga's obscenity statute, which punished private possession of obscene matter, violated the First Amendment. Three concurring justices believed that the pornographic films seized were beyond the scope of a warrant for equipment, records and other material used or derived from an illegal wagering business. Not only did the majority fail to mention the Fourth Amendment issue, but even under the reasoning of the concurring Justices, the case is inapposite, since the basis for the seizure of the tapes was "the ideas which they contain," Stanford v. Texas, supra, 379 U.S. at 485, 85 S.Ct. at 512, thereby implicating First Amendment concerns
 
 
 [8]
 Of course, such "specification" may subject the authorities to worrisome claims that, on expressio unius est exclusio alterius grounds, a warrant fails to reach clearly relevant evidence
 
 
 [9]
 FRE 1001:
 (1) Writings and recordings. "Writings" and "recordings" consist of letters, words, or numbers, or their equivalent, set down by handwriting, typewriting, printing, photostating, photographing, magnetic impulse, mechanical or electronic recording, or other form of data compilation.
 
 
 [10]
 The Fourth Circuit has allowed imposition of cumulative punishments under RICO and mail fraud counts, 18 U.S.C. Sec. 1341. United States v. Grande, 620 F.2d 1026, 1030 (4th Cir.1980), cert. denied, sub nom. United States v. Castagna, 449 U.S. 830, 101 S.Ct. 98, 66 L.Ed.2d 35 (1980). The Eighth Circuit has allowed cumulative sentences under RICO and the Travel Act. United States v. Dean, 647 F.2d 779, 785 n. 14 (8th Cir.1981), cert. denied, 456 U.S. 1006, 102 S.Ct. 2296, 73 L.Ed.2d 1300 (1982). However, in both Grande and Dean, the Courts reached their result by focusing on the facts necessary to prove the crimes, rather than the legislative intent. Such a route is inapplicable here, where the RICO violation concerned an enterprise engaged in interstate or foreign commerce, 18 U.S.C. Sec. 1962(c), and the Travel Act violation concerned a business enterprise, 18 U.S.C. Sec. 1952(b) and Sec. 1952(a)(3)
 
 
 [11]
 He had in fact experienced such difficulties in setting up his Clarksburg offices
 
 
 [12]
 Dupoint v. United States, 388 F.2d 39 (5th Cir.1968), is not dispositive. There the trial judge had transferred a trial for the convenience of the prosecution, not the defendant. As discussed above, the district court's decision in the instant case was based on considerations that necessarily affected the defendant, and the public, as well, rendering nondispositive cases turning solely on the mere convenience of the judge or prosecution
 
 
 [13]
 Sec. 2515. Prohibition of use as evidence of intercepted wire or oral communications
 Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter.
 
 
 [14]
 In the words of Senator Hart, Sec. 2511(2)(d) was adopted to address situations in which the consenting or intercepting party "acts in any way with an intent to injure the other party to the conversation in any other way. For example the secret consensual recording may be made for the purpose of blackmailing the other party, threatening him, or publicly embarrassing him." 114 Cong.Rec. 14694 (May 28, 1968), quoted in United States v. Phillips, supra, at 325
 
 
 [15]
 Mem. Order, March 25, 1983, p. 8
 
 
 [16]
 A contrary result would place commercial taxi-drivers across the country in jeopardy of committing Mann Act violations merely by transporting women, who turn out to be prostitutes, to and from an airport, train station, or bus station
 
 
 [17]
 See generally, United States v. Elliott, 571 F.2d 880 (5th Cir.1978), cert. denied, sub nom. Hawkins et al. v. United States, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978)
 Thus, the object of a RICO conspiracy is to violate a substantive RICO provision--here, to conduct or participate in the affairs of an enterprise through a pattern of racketeering activity--and not merely to commit each of the predicate crimes necessary to demonstrate a pattern of racketeering activity.
 Id. at 902. See also United States v. Griffin, 660 F.2d 996, 999-1001 (4th Cir.1981).
 Proof of the existence of an associated-in-fact enterprise requires proof of a "common purpose" animating its associates, and this may be done by evidence of an "ongoing organization, formal or informal," of those associates in which they function as a "continuing unit."
 Id. at 1000, citing United States v. Turkette, 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981).