880 F.2d 415
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v
David COOPER, Defendant-Appellant.
 No. 88-1078.
 United States Court of Appeals, Sixth Circuit.
 July 28, 1989.
 
 Before KEITH and KENNEDY, Circuit Judges and RICHARD B. McQUADE, Jr., District Judge.*
 PER CURIAM.
 
 
 1
 Defendant David Cooper appeals his jury conviction for (1) violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. Sec. 1962(c); (2) conspiracy to violate RICO, 18 U.S.C. Sec. 1962(d); (3) conspiracy to distribute prescription-drug controlled substances in violation of 21 U.S.C. Secs. 846 & 841(a)(1); (4) conspiracy to commit mail fraud in violation of 18 U.S.C. Secs. 371 & 1341; and (5) violation of the mail fraud statute, 18 U.S.C. Sec. 1341. Cooper challenges the sufficiency of the evidence to support his conviction on the above charges. We affirm.
 
 I. Background
 
 2
 In original and superseding multi-count, multi-defendant indictments, dated April 24 and August 28, 1987, respectively, David Cooper, a licensed pharmacist, was charged with the five counts of violating, and conspiracy to violate, the RICO, controlled substance, and mail fraud statutes on which he was ultimately convicted. Jt.App. 10-92. Cooper was indicted along with 23 other individual defendants, including 17 licensed pharmacists, and 29 Southeastern Michigan retail pharmacy corporations which were part of the Unarex/Motor City Pharmacy Group. With the exception of Cooper, all defendants pled guilty before trial.[1]
 
 
 3
 Cooper's three week trial began on November 3, 1987. The government introduced evidence to prove that Cooper was part of a wide-ranging, decade-long conspiracy to engage in fraudulent insurance company billing, controlled substance violations and mail fraud by more than twenty pharmacies. The conspiracy was directed by the principals of the Unarex/Motor City chain of retail pharmacies--Melvin Boyer, Nathan Pack, and Paul Mittleman. Specifically, the two alleged schemes involved (1) filling customers' prescriptions with generic drugs, but billing the insurance companies for higher priced brand name drugs; and (2) filling large quantities of forged and illegal prescriptions for controlled-substance Schedule II drugs presented by dealers of "street drugs."
 
 
 4
 Cooper's involvement with Unarex began in late 1981, when the Unarex principals purchased Karp Pharmacy. In January 1982, Cooper was approached on their behalf by Gary Ingram, who offered to make Cooper a loan to enable Cooper to purchase 25% of Karp; Karp's other owners were the Unarex principals and Ingram. The loan was to be repaid out of the pharmacy's profits. Cooper managed the pharmacy, with Unarex handling Karp's payroll, corporate checkbook, paying the invoices for generic drugs, and receiving the insurance company checks sent through the United States mails.
 
 
 5
 The first of the two schemes, fraudulent generic substitution, involved substituting cheaper generic drugs for more expensive "brand name" drugs. The Government presented evidence that a customer would receive the cheaper generic drug, but the insurance company would be fraudulently billed for the brand name drug. Cooper, or one of his employees, would place a "double slash" mark on the prescription to indicate that a generic had been dispensed, but a brand name billed. Two of these employees, Shirley Bogoff and Grayce Alfonsi, were hired to replace experienced pharmacy technicians when Unarex purchased Karp Pharmacy. They testified that Cooper personally taught them the "double slash" mark system. A third employee with 12 years of experience as a pharmacy technician, Deborah Garver, testified that she did not engage in generic substitution, but that specific billings, including those in Cooper's handwriting, involved such substitution. Insurance companies, including Blue Cross/Blue Shield of Michigan, would pay Karp Pharmacy for the more expensive drug, sending payment through the United States mail to Unarex headquarters.
 
 
 6
 The second scheme involved the illegal distribution of controlled substances. The Government presented evidence that a "runner," a dealer of street drugs, would present Cooper or one of his employees with large numbers of forged or illegal prescriptions for "Schedule II" drugs,[2] including dilaudid, talwin, preludin, and quaaludes. The runner would also hand over a large amount of cash. One runner subpoenaed as a witness, Ann Gentry, testified that she would usually put about $12,000 in a manilla envelope to pay for 1,000 tablets of dilaudid. Another witness, Mabel Hickey, testified that in one instance a runner sent by Gary Ingram openly displayed two pouches filled with prescriptions and handed two prescriptions over to a visibly agitated Cooper, who then filled the orders.
 
 
 7
 Finally, the Government introduced evidence that Cooper's controlled-substance prescription files were "shuffled" and misdated to make them appear more legitimate. The files included hundreds of forged Dr. Rhee and Dr. Horton prescriptions. Doctors Rhee and Horton testified that Cooper filled the prescriptions without once contacting them to verify that the prescriptions were valid.
 
 
 8
 On November 19, 1987, the jury found Cooper guilty on all five counts. On January 7, 1988, the court imposed concurrent three-year sentences on each count, plus a $5,000 committed fine, $250 in felony assessments, and forfeiture of Cooper's pharmacy license. The court denied Cooper's motion for acquittal pursuant to Rule 29(c), Fed.R.Crim.P. On appeal, Cooper challenges the sufficiency of the evidence to support his conviction on each of the five counts. Based on our examination of the record and consideration of the parties' briefs, we find no merit in Cooper's assertions.
 
 II.
 A. Standard of Review
 
 9
 A criminal defendant challenging the sufficiency of the evidence bears a heavy burden. The standard of review applied by this Court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original). See United States v. Bourjaily, 781 F.2d 539, 544 (6th Cir.1986), aff'd, 483 U.S. 171 (1987) (quoting Jackson ). All evidence must be viewed in the light most favorable to the government. See, e.g., Glasser v. United States, 315 U.S. 60, 80 (1942); United States v. Chandler, 752 F.2d 1148, 1151 (6th Cir.1985); United States v. Pennell, 737 F.2d 521, 537 (6th Cir.1984), cert. denied, 469 U.S. 1158 (1985). Further, this Court may not make credibility determinations or weigh the evidence; those functions are within the province of the jury. Glasser, 315 U.S. at 80; United States v. Stull, 743 F.2d 439, 442 (6th Cir.1984), cert. denied, 470 U.S. 1062 (1985). Finally, circumstantial evidence alone can sustain a guilty verdict. United States v. Stone, 748 F.2d 361, 362 (6th Cir.1984).
 
 B. Sufficiency of the Evidence
 
 10
 Based on the above standard of review, we conclude that the evidence was sufficient to support Cooper's conviction on each of the five counts. First, under Count Two of the indictment, the substantive violation of RICO, 18 U.S.C. Sec. 1962(c), the government was required to prove four elements: (1) defendant engaged in an enterprise; (2) the enterprise affected interstate commerce; (3) defendant's conduct or participation in the enterprise was conducted through a pattern of racketeering activity; and (4) the pattern of racketeering involved two or more of the racketeering offenses set out in the statute. See United States v. Sutton, et al., 642 F.2d 1001, 1008 (6th Cir.1980), cert. denied, 453 U.S. 912 (1981). Cooper contends that the evidence was insufficient to prove a "pattern of racketeering activity" or an "enterprise."
 
 
 11
 With respect to the "pattern of racketeering activity," Cooper challenges the pattern of mail fraud offenses under 21 U.S.C. Secs. 841(a)(1) & 846, involving the generic substitution scheme. Cooper argues that one of his employees, pharmacy technician Grayce Alfonsi, was unsure about the fraudulent billing procedure, and did not know anything was "wrong." The evidence was sufficient, however, to establish the billing fraud for two main reasons. First, Alfonsi herself testified that she engaged in generic substitution. She stated, "When I was taught how to bill, Mr. Cooper instructed me [to dispense the generic and bill Blue Cross for the brand name drug]." Witness Shirley Bogoff, another pharmacy technician, also testified that Cooper instructed her on the fraudulent billing scheme. A third technician, Deborah Garver testified that Cooper and the other technicians engaged in the practice, although she did not. With regard to not knowing it was "wrong," the jury could have inferred that Alfonsi and Bogoff did not know that the billing procedure was illegal because of their inexperience as pharmacy technicians. Alternatively, the jury could have found this portion of their testimony not credible.
 
 
 12
 Cooper's conviction under section 1962(c) is also supported by his own admission that he engaged in generic substitution for "bookkeeping purposes." He explains that insurance companies tightened their procedures in 1984 to require dispensing only generic drugs in some instances. If he did not have the generic on hand, he would dispense a brand name, and "take" the loss without passing it on to the customer. He would then substitute the generic on the next prescription to balance the "loss" with a "gain." This "bookkeeping" argument fails not only because no evidence was submitted at trial on this defense except his self-serving testimony, but also because it did not constitute a valid defense. Both the government's and defendant's pharmacy experts testified that it is always wrong to dispense generic and bill for brand name drugs. Moreover, even after being warned that it was wrong, the evidence shows that Cooper continued to engage in the practice.
 
 
 13
 The "enterprise" requirement was also clearly satisfied. The Unarex/Motor City Pharmacy Group was an "enterprise" of associated retail pharmacies, pharmacists and employees existing in corporate form, with interlocking ownership and management, for over a decade. Unarex did $90 million in billings to Blue Cross/Blue Shield alone between 1971 and 1985. Unarex purchased millions of dollars worth of medication manufactured outside of Michigan, thus also meeting the interstate commerce requirement.
 
 
 14
 With respect to Count One of the indictment, Cooper contends that there was insufficient evidence linking him to a conspiracy to violate RICO, 18 U.S.C. Sec. 1962(d). The evidence is sufficient to support both the fact that a conspiracy existed, and that Cooper was a member of that conspiracy. See United States v. Truglio, 731 F.2d 1123 (4th Cir.), cert. denied, 469 U.S. 862 (1984). Cooper cannot seriously dispute the existence of a RICO conspiracy involving the Unarex/Motor City Pharmacy Group and its principals--Boyer, Pack, and Mittleman--who all pled guilty. Once a conspiracy is established, the government need only provide "slight additional evidence" of the defendant's participation in the conspiracy. United States v. Hamilton, 689 F.2d 1262, 1275 (6th Cir.1982), cert. denied, 459 U.S. 1117 (1983). Cooper's agreement to participate in the RICO conspiracy may be inferred from his acts. United States v. Joseph, 835 F.2d 1149, 1152 (6th Cir.1987).
 
 
 15
 More than slight evidence exists to link Cooper to the conspiracy. First, although he argues that the "double slash" system was merely a bookkeeping device, it was identical to the "code" created by Melvin Boyer, one of the Unarex principals, and used at other Unarex pharmacies. Another codefendant, Ronald Drexler, testified that it was taught to him "from day one," and that the code was used throughout the Unarex pharmacy chain. A rational trier of fact could have inferred that a Unarex official also taught the code to Cooper. Second, additional inferences could be drawn from the fact that Unarex handled Karp's payroll, corporate checkbook, paying for invoices on generic drugs, receiving insurance company checks fraudulently billed by Karp, and splitting the profits of Karp.
 
 
 16
 Cooper argues on the third count, conspiracy to distribute controlled substances in violation of 21 U.S.C. Secs. 846 & 841(a)(1), that the jury misinterpreted Nathan Pack's testimony that Gary Ingram was sending Cooper "Schedule II" patients, and that Ann Gentry was not credible and was a surprise witness. However, as we explained in Part II.A. above, this Court may neither make credibility determinations nor weigh the evidence. As to the surprise witness argument, the defendant was not entitled to a witness list. See United States v. Carter, 621 F.2d 238, 240 (6th Cir.), cert. denied, 449 U.S. 858 (1980). Moreover, the witness was not a "surprise" in light of the fact that Cooper's attorney was attacking the government for not producing Gentry at trial. The government subsequently located and subpoenaed her as a witness, with no objection or request for a continuance from Cooper's attorney.
 
 
 17
 The last two counts, violation and conspiracy to violate the mail fraud statute, 18 U.S.C. Secs. 371 & 1341, were supported by the evidence of the generic substitution scheme discussed above. The insurance companies paid the fraudulent billings by checks sent through the United States mail. Cooper's argument that Nathan Pack at one time warned him to stop his fraudulent practices and could not, therefore, be a co-conspirator, is without merit. The purported warning could as easily be interpreted as a warning not to get caught.
 
 
 18
 The judgment of the District Court is AFFIRMED.
 
 
 
 *
 Honorable Richard B. McQuade, Jr., United States District Judge for the Northern District of Ohio, sitting by designation
 
 
 [1]
 Following the trial and conviction of Cooper, this Court vacated codefendant Marvin Goldberg's plea and remanded the case for repleading based on the trial court's failure to secure a sufficient factual basis for the original plea. No such issue arises in the present case. See United States v. Goldberg, 862 F.2d 101 (6th Cir.1988). A second defendant was never arrested or identified, and the government voluntarily dismissed the charges against two other defendants
 
 
 [2]
 See 21 U.S.C. Sec. 812(b)(2)